**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**January 2, 2007**

**Elisabeth A. Shumaker**
**Clerk of Court**

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

TANZITARO GUERRERO,

Defendant-Appellant.

No. 06-3123

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**
**(D.C. NO. 05-CR-40003-01-SAC)**

James A. Brown, Assistant United States Attorney (Eric F. Melgren, United States Attorney, with him on the brief), Topeka, Kansas, for Plaintiff-Appellee.

Daniel E. Monnat, Monnat & Spurrier, Wichita, Kansas, for the Defendant-Appellant.

Before **HARTZ, O'BRIEN**, and **McCONNELL**, Circuit Judges.

**McCONNELL**, Circuit Judge.

This case presents a variation on the usual traffic-stop search-and-seizure case: namely, that there was no traffic stop to begin with. Tanzitaro Guerrero and Alfredo Torres were parked at a gas station when they attracted the interest of a

pair of officers eating lunch at a nearby sandwich shop. Starting from a near-idle inquiry, the officers, through observation and questioning, formulated a reasonable suspicion that the two men were transporting illegal drugs. The officers temporarily seized Mr. Guerrero's driver's license and subsequently acquired consent to search the car, where they discovered a quantity of methamphetamine.

We hold that the detention was supported by reasonable suspicion, and thus that it neither violated the Fourth Amendment nor tainted the search that followed it. We also hold that the search itself was consensual. Accordingly, we affirm the district court's decision not to suppress the evidence found in the car and uphold Mr. Guerrero's conviction.

## I. Background

On Jan. 8, 2005, at 12:30 p.m., Mr. Guerrero and Mr. Torres stopped at a Phillips-66 station in Topeka, Kansas. Two Kansas police officers, Brian Rhodd and Tom Bronaugh, were eating lunch at a nearby Quizno's sandwich shop. Deputy Rhodd's suspicion was aroused by the difference in the two men's dress – one was in jeans and one in dress clothes – and ages, and the fact that their license plate was from California, which he considered to be a drug source state. Deputy Rhodd approached Mr. Torres and Mr. Guerrero and questioned them separately about their travel plans.

Deputy Rhodd found the two defendants' stories suspicious: Mr. Torres said they were both headed to Kansas City to work construction for two weeks; Mr. Guerrero said he was going to Kansas City for a day to drop off Mr. Torres, his uncle, and then would return immediately to Los Angeles.[1]  When Deputy Rhodd asked Mr. Guerrero how his uncle had traveled to California, Mr. Guerrero did not know.  Deputy Rhodd observed that Mr. Guerrero's demeanor shifted at this point from "being defensive to overly polite and overly cooperative, which made me believe that something wasn't right with him."  Aplt. App. at 126. Deputy Rhodd also noticed that the car key was alone on a single key ring and that there was unspecified religious paraphernalia on the gear shift of the car, both of which he considered characteristic of drug runners.  He looked through the window and saw that clothes were simply thrown across the back seat; none of them seemed to be intended for construction work, and he did not observe any construction tools.

Deputy Rhodd then asked to see the two men's identifying documents and the car's registration.  Mr. Guerrero provided a California driver's license and the car's registration, and Mr. Torres provided a Mexican identification card, which the officer thought might not be authentic.  When Deputy Rhodd asked to whom the car was registered, he thought Mr. Guerrero attempted to read the name off

---

[1]Subsequent questioning made clear that the two men are not, in fact, blood relatives.

the registration. Mr. Guerrero said that the car belonged to his girlfriend, "Goudimas;" the registration indicated that the owner was "Elizabeth Goudima."

Deputy Rhodd took the documents back to his patrol car, and he asked the two men no questions for ten to twelve minutes while he ran Mr. Guerrero's licence and the car's registration. He discovered that the license and registration were valid, and the there were no outstanding warrants for Mr. Guerrero's arrest. Deputy Rhodd also learned that the car had traveled back and forth to Mexico a number of times over the preceding months. He called the El Paso Intelligence Center, which told him – wrongly, as it turned out – that Mr. Guerrero was not legally permitted to be in the country.

The officer returned the paperwork and thanked the men for their time. He walked away, then stopped after a few seconds, turned back around, and asked Mr. Guerrero several new questions, including, eventually, for consent to search the car. Mr. Guerrro replied that the car belonged to his girlfriend, so he could not consent.

At this point, testimony diverges. Deputy Rhodd testified that he explained to Mr. Guerrero that he had the capacity to consent, but did not have to; Mr. Guerrero remembers no such explanation. Deputy Rhodd testified that Mr. Guerrero verbally consented when asked a second time; Mr. Guerrero testified that he refused consent, and that Deputy Rhodd then asked a third time. Both agree that Mr. Guerrero eventually extended both hands, palms up, in response to

a request for consent. Deputy Rhodd proceeded to search the car. He found 4.5 kilograms of methamphetamine near the gas tank.

Mr. Guerrero and Mr. Torres were both arrested and subsequently charged in the District of Kansas under 21 U.S.C. § 841(a)(1) with one count of possession with intent to distribute methamphetamine. After a hearing, the district court denied the defendants' motion to suppress the evidence found in the car, finding that "[a]ssuming, arguendo, that the voluntary encounter turned into a detention for the period of time that the officer had possession of the defendants' identifications and vehicle registration," the detention was supported by reasonable suspicion, and the subsequent consent was valid. Order at 11-13, 20. Both defendants pleaded guilty, reserving the right to appeal the suppression ruling, and Mr. Guerrero was sentenced to 120 months imprisonment. He timely appealed.

## II. Discussion

### A. Illegal Detention

Mr. Guerrero argues that he was detained without reasonable suspicion, and that the methamphetamine found in the car he was driving should be suppressed as a fruit of that illegal detention. "[T]he unlawful detention inquiry is fact-intensive, and we review the district court's fact findings for clear error." *United States v. Dewitt*, 946 F.2d 1497, 1502 (10th Cir. 1991) (citation omitted). However, the ultimate issue of whether a seizure occurred is a question of law,

which we review *de novo*. *United States v. Torres-Guevara*, 147 F.3d 1261 (10th Cir. 1998).

### i. Seizure

The government argues that the taking of Mr. Guerrero's license and registration did not amount to a detention, because Deputy Rhodd did not inform the defendants that they had to hand over their papers. Rather, "he asked them and they voluntarily complied." Aplt. Br. at 21. To be sure, if officers merely examine an individual's driver's license, a detention has not taken place. *Florida v. Royer*, 460 U.S. 491, 501 (1983). But once the officers take possession of that license, the encounter morphs into a detention: "Precedent clearly establishes that when law enforcement officials retain an individual's driver's license in the course of questioning him, that individual, as a general rule, will not reasonably feel free to terminate the encounter." *United States v. Lambert*, 46 F.3d 1064, 1068 (10th Cir. 1995). During the time that Deputy Rhodd held their paperwork, Defendants were detained.

### ii. Reasonable Suspicion

Investigative detentions must be supported by reasonable suspicion, and they must be no longer than necessary to accomplish their objectives. *United States v. Gutierrez-Daniez*, 131 F.3d 939, 942 (10th Cir. 1997). Although the great majority of reasonable suspicion cases begin as compulsory traffic stops, an encounter that begins voluntarily and becomes a detention is subject to the same

-6-

standards. That premise is supported by the long line of airport detention cases, in which courts have allowed law enforcement officers to approach and detain travelers when supported by reasonable suspicion. In *Royer*, where detectives detained the defendant in the boarding area on suspicion of being a drug courier, the Court held that temporary detention supported by reasonable suspicion is permissible "where the public interest involved is the suppression of illegal transactions in drugs." 460 U.S. at 498-99. We reaffirmed that position in *Lambert*, a case in which police officers detained the defendant in an airport parking lot when no vehicular violation had occurred. *Lambert*, 46 F.3d at 1064. We held that reasonable suspicion remains the proper standard for police to take and run the defendant's license, even when the encounter begins consensually: "While not directly on point – the agents here were not concerned with whether Mr. Lambert could lawfully operate a motor vehicle or in issuing a traffic citation – the principle of the traffic stop cases . . . does apply." *Id.* at 1068 n.3; *see also United States v. Lopez*, 443 F.3d 1280, 1282, 1286 (10th Cir. 2006) (holding reasonable suspicion to be the proper standard for the seizure of a driver's license when officers approach defendants and their parked car by the side of the road). Our precedent makes clear that officers may ask for a defendant's license, given reasonable and articulable suspicion, even in the absence of any compelling basis to begin the questioning.

Reasonable suspicion is defined as "particularized and objective basis for suspecting the particular person stopped of criminal activity." *United States v. Cortez*, 449 U.S. 411, 417-18 (1981). In assessing reasonable suspicion, we defer to trained law enforcement personnel, "allow[ing] officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that 'might well elude an untrained person.'" *Unites States v. Arvizu*, 534 U.S. 266, 273 (2002) (quoting *Cortez,* 449 U.S. at 418). "The evaluation is made from the perspective of the reasonable *officer*, not the reasonable *person*," *United States v. Quintana-Garcia*, 343 F.3d 1266, 1270 (10th Cir. 2003). The Supreme Court has instructed that we not examine each factor adding up to reasonable suspicion individually, but that we evaluate how convincingly they fit together into a cohesive, convincing picture of illegal conduct. In *Arvizu*, the Court rejected what it called a "divide-and-conquer analysis," noting that reasonable suspicion may exist even if "each observation" is "susceptible to an innocent explanation." *Arvizu*, 534 U.S. at 274.

To be sure, a number of the factors Deputy Rhodd cites as providing reasonable suspicion are justifications we have found so broad as to be indicative of almost nothing. The fact that the defendants were traveling from a drug source city – or, as Deputy Rhodd first noted upon approaching the car, a drug source state – does little to add to the overall calculus of suspicion: "If travel between

-8-

two of this country's largest population centers is a ground on which reasonable suspicion may be predicated, it is difficult to imagine an activity incapable of justifying police suspicion and an accompanying investigative detention. Our holding that *suspicious* travel plans can form an element of reasonable suspicion should not be taken as an invitation to find travel suspicious per se." *United States v. Santos*, 403 F.3d 1120, 1132 (10th Cir. 2005).

The presence of religious iconography in the vehicle is, similarly, not merely consistent with innocent conduct but so broad as to provide no reasonable indicium of wrongdoing. *Cf. United States v. Valenzuela*, 365 F.3d 892, 900 (10th Cir. 2004) (dismissing as "beyond the pale" the government's argument that the presence of American flag decals on a car contributed to reasonable suspicion). Under some circumstances, particular religious symbols – notably those identified with gangs – might provide meaningful indicia of reasonable suspicion. But by citing undifferentiated "religious iconography" as grounds for reasonable suspicion, Deputy Rhodd equates generalized religious expression with criminal activity, a connection that we cannot support as reasonable. *United States v. Ramon*, 86 F.Supp.2d 665, 677 (W.D. Tex. 2000) ("while religious symbols on vehicles cannot shield such vehicles from a reasonable suspicion inquiry, neither can religious symbols alone (or even together with other inconsequential factors) be employed to justify a reasonable suspicion stop").

Nevertheless, other factors cited by Deputy Rhodd coalesce into a scenario sufficient to give rise to a reasonable suspicion of criminal activity. As the officer explained in his testimony, "people who may carry narcotics in their vehicle, sometimes they'll be matched together, they don't really know each other." Aplt. App. at 115. The observations Deputy Rhodd made of Mr. Torres and Mr. Guerrero supported the interpretation that the two men were strangers, paired only for a drug run: they differed in age and manner of dress, and Mr. Guerrero did not seem to know how Mr. Torres, his purported uncle, had arrived into the United States from Mexico. The lone key on a single ring similarly indicated, however weakly, that this was not a car that Mr. Guerrero drove regularly. Although these factors, standing alone, would not amount to reasonable suspicion, they were consistent with a broader story, and with the more specific, suspicious factors enumerated below.

Most important to the overall evaluation, however, are Mr. Guerrero's uncertain answer to the question about the car's ownership and the two men's differing renditions of their travel plans. The fact that Mr. Guerrero, a fluent English speaker, would mispronounce the name of his purported girlfriend, while attempting to read her name off the registration, is an articulable, suspicious factor. And the fact that one defendant indicated that both men were staying in Kansas City, while the other indicated that he was only there for a quick stop, adds strongly to Deputy Rhodd's overall impression that the two men were

strangers, together only for the purpose of hauling drugs. *See, e.g. United States v. Kopp*, 45 F.3d 1450, 1454 (10th Cir. 1995) (defendants' "implausible and inconsistent" travel plans created a basis for reasonable suspicion); *United States v. Zubia-Melendez*, 263 F.3d 1155, 1162 (10th Cir. 2001).

### iii. Termination of Detention

Mr. Guerrero does not argue that Deputy Rhodd held onto his license longer than necessary to ascertain identification and registration. *Lambert*, 46 F.3d at 1068 n.3 ("[A]n individual's identification should be retained no longer than necessary to accomplish the purpose for its request."). Thus the only remaining question relating to the detention is when it ended. The government argues, and the district court agreed, that the detention ended when Mr. Rhodd handed back defendants' papers, thanked them for their time, and began walking away. Although such a determination is context-specific, in general those actions are sufficient to indicate that an individual is free to leave. *United States v. Ledesma,* 447 F.3d 1307, 1315 (10th Cir. 2006) (use of the phrase "thank you" signaled the end of detention); *United States v. Elliott*, 107 F.3d 810, 814 (10th Cir. 1997) (handing back of documents enough to end detention). Mr. Guerrero claims that the detention continued because Deputy Rhodd turned around very shortly after returning the papers and resumed his questioning. We have held that "returning a driver's documentation may not end the detention if there is evidence of 'a coercive show of authority, such as the presence of more than one officer,

the display of a weapon, physical touching by the officer, or his use of a commanding tone of voice indicating that compliance might be compelled.'" *United States v. Bustillos-Munoz*, 235 F.3d 505, 515 (10th Cir. 2000) (quoting *United States v. Turner*, 928 F.2d 956, 959 (10th Cir. 1991)). Two of those factors existed here, but only in the mildest of forms: Sergeant Bronaugh sat a distance away and had no interaction with Mr. Guerrero or Mr. Torres, and the police car was stationed next to the Defendant's car, though not in a position to block it. There is nothing in this set of facts that counsels disturbing the district court's determination that the detention ended after the papers were returned.[2]

## B. Consent

Because Mr. Guerroro's detention was lawful and ended promptly, we are left only to examine the voluntariness of his subsequent consent. Voluntariness is a factual issue, determined through the totality of the circumstances. *United States v. West*, 219 F.3d 1171, 1177 (10th Cir. 2000). We review the district court's finding of consent under the clearly erroneous standard, because "the credibility of the witnesses and the weight to be given the evidence, together with the inferences, deductions and conclusions to be drawn from the evidence, are all

_____

[2]The government argues in the alternative that Deputy Rhodd had probable cause to arrest Mr. Guerrero for illegal reentry, so any detention was legal. The district court made no such finding, and we need not reach the issue, as our other rulings dispose of the matter.

matters" most appropriate for resolution by the district court. *United States v. Walker*, 933 F.2d 812, 815 (10th Cir. 1991). This holds "particularly true where, as here, the credibility of witnesses is important on the issue of voluntariness." *United States v. Guzman,* 864 F.2d 1512, 1521 (10th Cir. 1988).

For consent to be valid, two conditions must be met: "(1) There must be a clear and positive testimony that consent was unequivocal and specific and freely given; and (2) The government must prove consent was given without duress or coercion, express or implied." *United States v. Butler*, 966 F.2d 559, 562 (10th Cir. 1992).

To satisfy the first prong of the voluntariness requirement, a defendant's consent must be clear, but it need not be verbal. Consent may instead be granted through gestures or other indications of acquiescence, so long as they are sufficiently comprehensible to a reasonable officer. *United States v. Benitez*, 899 F.2d 995, 998-99 (10th Cir. 1990); *United States v. Gordon*, 173 F.3d 761, 765-66 (10th Cir. 1999). Nor is an officer required to inform a defendant explicitly that he is free to go before requesting permission to search, *Ohio v. Robinette*, 519 U.S. 33, 39-40 (1996); *Ledesma*, 447 F.3d at 1314, or to refrain from renewing his request for consent after a defendant has at first denied it, *Zubia-Melendez*, 263 F.3d at 1163. Moreover, we have specifically held that non-verbal consent may validly follow a verbal refusal. *United States v. Flores*, 48 F.3d 467, 468-69 (10th Cir. 1995).

The second prong, requiring that the consent be free of coercion, turns on whether a reasonable person would believe he was free to leave or to deny the officer's request to search. *Ledesma*, 447 F.3d at 1314. In determining whether consent was coerced, we consider factors such as:

> the threatening presence of several officers; the brandishing of a weapon by an officer; some physical touching by an officer; use of aggressive language or tone of voice indicating that compliance with an officer's request is compulsory; prolonged retention of a person's personal effects such as identification and plane or bus tickets; a request to accompany the officer to the station; interaction in a nonpublic place or a small, enclosed place; and absence of other members of the public.

*United States v. Sanchez*, 89 F.3d 715, 718 (10th Cir. 1996).

Mr. Guerrero essentially concedes the first element of the consent test: he testified that his gesture was indeed meant to let Deputy Rhodd know that he could search the car. This accords with the objective notion that a palms-up signal indicates consent. Mr. Guerrero contends, however, that that permission was given under duress: "Well, I was just being submissive because I couldn't do nothing. . . . He was going to search the car anyways." Aplt. App. 213. The district court gave no credence to Mr. Guerrero's claims that his consent was coerced, and we have no basis for finding this conclusion clearly erroneous. Mr. Guerrero's argument relies largely on the fact that he was still being detained, an issue we dispose of above. *See supra* Part II.A.iii. Mr. Guerrero gave his consent only a minute or two after the initial detention ended. In the interim, Deputy Rhodd engaged in no new use of the coercive factors laid out in *Sanchez*. He

-14-

merely asked several new, more targeted questions.  Nothing that occurred in that short time changes our interpretation that a reasonable man in Mr. Guerrero's shoes would feel free to leave or to deny Deputy Rhodd's request.  The district court also notes that neither Defendant objected during the search itself, which, while not dispositive, is often a good indicator that consent existed.  *United States v. Pena*, 920 F.2d 1509, 1515 (10th Cir. 1990).  The district court's ruling is, at a minimum, not clear error.

### III. Conclusion

Because we find that Mr. Guerrero was not illegally detained and that he validly consented, we AFFIRM the judgment of the district court.