**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**September 11, 2007**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

UNITED STATES OF AMERICA,

      Plaintiff-Appellee,

v.

ANTHONY R. ROMERO,

      Defendant-Appellant.

No. 06-3092
(D.C. No. 05-CR-10080-01-WEB)
(D. Kan.)

**ORDER AND JUDGMENT**[*]

Before **O'BRIEN**, **HOLLOWAY**, and **HOLMES**, Circuit Judges.

Defendant-Appellant Anthony R. Romero was convicted by a jury of three counts of possession with intent to distribute a controlled substance in violation of 21 U.S.C. § 841(a)(1) and sentenced to 160 months in prison. Mr. Romero appeals the district court's denial of his motion to suppress evidence related to the third count – specifically, the cocaine found during an April 10, 2005 police search of a closet containing Mr. Romero's personal belongings. We exercise jurisdiction under 28 U.S.C. § 1291 and **AFFIRM**.

---

[*] This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. It may be cited, however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

# I. BACKGROUND

At approximately 2:00 A.M. on April 10, 2005, Wichita, Kansas police officers responded to a call from a neighbor reporting a domestic disturbance at 1802 South Madison. Sergeant Espinoza was one of at least five officers who responded to the domestic disturbance call. Sgt. Espinoza was standing outside the residence when he saw Mr. Romero, a Hispanic male, running southbound on an adjoining street. Sgt. Espinoza followed Mr. Romero and found him hiding in bushes. Drawing his gun, Sgt. Espinoza ordered Mr. Romero out of the bushes, patted him down, and instructed him to sit on the curb.

Although Sgt. Espinoza was able to converse with Mr. Romero, he testified at the suppression hearing that Mr. Romero's English was not very good and he had experienced some difficulty communicating with him. Sgt. Espinoza called for a Spanish-speaking officer to come to the residence due to the possibility that the residents of the house did not speak English well and to make sure he was "covering all the bases." Moreover, Sgt. Espinoza testified that Mr. Romero did not smell of alcohol and his demeanor and actions did not indicate that he had been drinking.

Mr. Romero falsely identified himself as "Jose Gonzales." He told Sgt. Espinoza that he and his brother had been involved in a bar fight and that he was running from people who had injured his brother. Mr. Romero claimed that his brother was at a nearby residence, but he could not remember which house. Sgt.

Espinoza called dispatch to verify this account and was informed that no disturbance had been reported from any bar in the area. At this time, Officers Boone and Shelton arrived on the scene and stayed with Mr. Romero while Sgt. Espinoza returned to the residence, where no one had yet gained access to the house. After several other officers knocked on the door and windows of the residence, Ms. Michelle Montoya eventually answered and let the officers into the residence. The officers quickly checked the residence and determined that Ms. Montoya and three children were the only ones present in the residence.

Meanwhile two blocks away, Officer Boone asked Mr. Romero for his name and date of birth. Mr. Romero responded that his name was "Jose Gonzales" and that he was born April 27, 1978. Officer Boone also asked Mr. Romero if he had ever been in jail and Mr. Romero answered affirmatively. Officer Boone ran the name "Jose Gonzales" through the SPIDER identification database to check if there were any outstanding warrants. However, the database did not locate any individual by that name. At the suppression hearing, Officer Boone testified that he asked Mr. Romero his name at least three times during this encounter, and all three times, Mr. Romero identified himself as "Jose Gonzales." Mr. Romero also told Officer Boone the same account of how his brother was injured and that his brother was in a nearby house.

Sgt. Espinoza radioed Officer Boone requesting him to ask Mr. Romero if he was willing to come to the residence at the 1800 block of Madison. Officer

Boone drove Mr. Romero approximately two blocks to the residence. Mr. Romero rode in the back of the patrol car, but Officer Boone did not handcuff him. At the residence, the officers continued their attempts to ascertain Mr. Romero's identity. After being informed that he could face charges for giving the officers a false name, Mr. Romero identified himself as "Victor Gonzales" and stated that his date of birth was July 7, 1978.

At Sgt. Espinoza's request, Ms. Montoya agreed to come out of the house to see if she could identify Mr. Romero. Ms. Montoya identified Mr. Romero as her boyfriend, Anthony Romero. Sgt. Espinoza was familiar with the name "Anthony Romero" from his previous work in the Narcotics Division, and consequently, suspected Mr. Romero of dealing drugs. However, Mr. Romero steadfastly maintained that his name was "Victor Gonzales," and not "Anthony Romero." The officers ran the name "Anthony Romero" in the SPIDER database and determined that there were two outstanding felony arrest warrants. Upon learning of the outstanding warrants, the officers handcuffed Mr. Romero in the back of the patrol car. When Mr. Romero still insisted he was not "Anthony Romero," the officers asked him whether he had any identification inside the residence. Mr. Romero claimed that he thought he might have something inside the house proving that he was, in fact, "Victor Gonzales."

Inside the residence, Sgt. Espinoza informed Ms. Montoya that he suspected Mr. Romero of having drugs in the house and asked for her permission

-4-

to search the house. Ms. Montoya agreed, but expressly stated that Mr. Romero kept his belongings in a closet and that the officers would have to get Mr. Romero's permission to search that area. Sgt. Espinoza returned outside and told Mr. Romero that they needed to establish his identity and requested permission to search his belongings in the closet for identification. According to the officers, Mr. Romero agreed to the search. Although Sgt. Espinoza wanted to search for drugs in addition to the identification, he did not inform Mr. Romero of his suspicions regarding drug activity.

After obtaining Mr. Romero's oral consent, Sgt. Espinoza began searching Mr. Romero's closet which was located in a hallway between two bedrooms. Inside the closet, there were some clothes on hangers and some clothes folded on shelves. Beginning with the top shelf, Sgt. Espinoza began lifting up the folded shirts, looking underneath, and feeling any pockets to see if they contained identification. In between the folded clothes, Sgt. Espinoza discovered a white, non-transparent, "Wal-Mart type" shopping bag. Opening the shopping bag, Sgt. Espinoza saw a clear plastic bag containing what appeared to be rocks of crack-cocaine. After finding the bag, Sgt. Espinoza continued to search the closet for identification. He found various items including a police citation issued to "Anthony Romero" and pay stubs bearing the same name.

On May 3, 2005, Mr. Romero was charged with one count of unlawfully possessing, with intent to distribute, fifty grams or more of a mixture containing

detectable amounts of cocaine base.[1]  Mr. Romero filed a motion to suppress the cocaine, arguing that the police officers unlawfully searched the closet.  On September 22, 2005, the district court held an evidentiary hearing on Mr. Romero's Motion to Suppress.  Sgt. Espinoza, Officer Boone, and another officer who responded to the domestic disturbance call, Officer Izzard, testified at the hearing.  Mr. Romero and Ms. Montoya also testified.

Following the district court's denial of Mr. Romero's Motion to Suppress, Mr. Romero stood trial.  On December 9, 2005, the jury found Mr. Romero guilty on all three counts.  The district court sentenced Mr. Romero to a term of 160 months in prison.  Mr. Romero timely filed this appeal.

## II. DISCUSSION

In reviewing a denial of a motion to suppress, we consider the evidence in the light most favorable to the government (as the prevailing party) and accept the district court's factual findings unless clearly erroneous.  *United States v. Trotter*, 483 F.3d 694, 698 (10th Cir. 2007).  A finding is clearly erroneous when it is "without factual support in the record or we are left with the definite and firm conviction that a mistake has been made."  *United States v. Cernobyl*, 255 F.3d

---

[1]  On September 21, 2005 in a superseding indictment, Mr. Romero was charged with three counts:  (1) possession with intent to distribute 427 grams of marijuana on December 12, 2003; (2) possession with intent to distribute 5,235 grams of marijuana on June 17, 2004; and (3) possession with intent to distribute 50 grams of cocaine base on April 10, 2005.  This appeal is limited to reviewing the district court's denial of Mr. Romero's motion to suppress evidence related to Count 3.

1215, 1221 (10th Cir. 2001) (internal quotations omitted). The ultimate question of the reasonableness of a search, however, is reviewed de novo. *Trotter*, 483 F.3d at 698.

The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures . . . ." U.S. Const. amend. IV. Indeed, "physical entry into the home is the chief evil against which the . . . Fourth Amendment is directed." *Welsh v. Wisconsin*, 466 U.S. 740, 748 (1984) (quoting *United States v. U.S. Dist. Court for E. Dist. of Mich.*, 407 U.S. 297, 313 (1972)). Accordingly, warrantless searches and seizures conducted inside a home are presumptively unreasonable. *Payton v. New York*, 445 U.S. 573, 586 (1980); *Jones v. United States*, 357 U.S. 493, 497-98 (1958).[2] Nevertheless, the Fourth Amendment allows the warrantless search of a home when law enforcement officials obtain the voluntary consent of an individual with actual or apparent authority. *Georgia v. Randolph*, 547 U.S. 103, 109 (2006) (citing *Illinois v. Rodriguez*, 497 U.S. 177, 181 (1990) and *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973)).

On appeal, Mr. Romero claims that he did not consent to the search of the

---

[2] As Justice Jackson cogently explained, the rationale underlying the Fourth Amendment's requirement of a warrant is that the determination as to "[w]hen the right of privacy must reasonably yield to the right of search is, as a rule, to be decided by a [neutral and detached] judicial officer, not by a policeman or Government enforcement agent." *Johnson v. United States*, 333 U.S. 10, 13-14 (1948).

closet. Additionally, Mr. Romero contends that any consent given was involuntary because: (1) he was in police custody and handcuffed in the back of a patrol car at the time of his alleged consent; (2) he had been drinking heavily prior to the incident; and (3) he was deceived by the police officer who told him they were looking for identification and failed to inform him of the real purpose of the search, *i.e.*, to look for drugs. Finally, Mr. Romero argues that the officer exceeded the scope of his alleged consent to search for identification by opening an opaque shopping bag in which the cocaine was ultimately found. Each of these arguments lacks merit.

### A. The District Court Did Not Clearly Err in Finding that Mr. Romero Gave the Officers Consent to Search.

After holding an evidentiary hearing, the district court found that Mr. Romero "unequivocally" gave Sgt. Espinoza consent to search the closet. R. Vol. I, Doc. 25 at 6-7. Notwithstanding Mr. Romero's claim at the suppression hearing that he never gave the officers permission to search for identification, the district court found that during his August 2, 2005 interrogation by police, Mr. Romero stated that he could not remember whether he gave officers permission to search. Accordingly, the district court found that Sgt. Espinoza's testimony was more credible than that of Mr. Romero on the issue of consent.

The government bears the burden of proving, by a preponderance of the evidence, that unequivocal and specific consent was obtained. *United States v.*

*Guerrero*, 472 F.3d 784, 789 (10th Cir. 2007) (requiring "clear and positive testimony that consent was unequivocal and specific"). "[T]he credibility of the witnesses and the weight to be given the evidence, together with the inferences, deductions and conclusions to be drawn from the evidence, are all matters most appropriate for resolution by the district court." *Id.* (internal quotations omitted). *Accord United States v. Pena*, 920 F.2d 1509, 1513 (10th Cir. 1990) ("Assessment of the credibility of witnesses is the prerogative of the trial court, not an appellate court, which neither sees nor hears the witnesses.") Accordingly, determinations of witness credibility will not be disturbed unless they are clearly erroneous. "This holds particularly true where, as here, the credibility of witnesses is important on the issue of voluntariness [of consent to search]." *Guerrero*, 472 F.3d at 789 (internal quotations omitted).

Mr. Romero argues that the district court's credibility determination regarding Sgt. Espinoza is clearly erroneous because "[o]n two occasions, he was untruthful to the Court." Aplt. Opening Br. at 9. We disagree.

In the first cited instance, which occurred during the suppression hearing, Sgt. Espinoza testified on direct examination that he found the cocaine in a clear bag between folded clothes in the closet. Contrary to Mr. Romero's assertions, Sgt. Espinoza did not testify that the cocaine was in plain view as he sorted through the folded clothing. Subsequently, in response to more detailed questioning on cross-examination, Sgt. Espinoza clarified that the clear bag of

cocaine was inside a white, opaque "Wal-Mart- type" shopping bag. Such a clarification hardly impugns Sgt. Espinoza's credibility. We discern nothing in this example that would lead us to conclude that the district court's credibility determination is clearly erroneous.

In the second instance, Mr. Romero asserts that Sgt. Espinoza contradicted himself regarding the need for an interpreter. At the suppression hearing, Sgt. Espinoza testified that he had some difficulty communicating with Mr. Romero because Mr. Romero did not speak English well. Two months later at Mr. Romero's trial, Sgt. Espinoza testified that he did not recall having difficulty communicating with Mr. Romero.

After reviewing the transcript of the suppression hearing, however, Sgt. Espinoza conceded that initially he did have some difficulty communicating with Mr. Romero. Yet, Sgt. Espinoza consistently maintained that he called the Spanish-language interpreter to the residence in order to communicate with the individuals inside the house, not Mr. Romero. These purported "inconsistencies" in Sgt. Espinoza's testimony do not support a conclusion that the district court clearly erred in finding his testimony to be credible.

In sum, insofar as it rests on Sgt. Espinoza's alleged lack of veracity, Mr. Romero's challenge to the district court's credibility finding is wholly without merit. *See United States v. Cruz-Mendez*, 467 F.3d 1260, 1266 (10th Cir. 2006) (seeing "no reason *not* to defer to the court's credibility determination" where

district court credits law enforcement officer's testimony over that of defendant (emphasis added)), *cert. denied*, 127 S. Ct. 1027 (2007).[3]

Finally, Mr. Romero argues, for the first time on appeal, that the failure to provide a consent-to-search form supports giving him the benefit of the doubt that he did not, in fact, consent, unless there is some justification for why the consent was not documented. As support, Mr. Romero argues that "[a]s a matter of policy, law enforcement should be held to a higher burden of verification or documentation when obtaining consent to search a home." Aplt. Opening Br. at 15. Mr. Romero cites no authority to undergird this proposition, however.

Generally, absent plain error resulting in manifest injustice, we will not consider issues that are raised for the first time on appeal. *See United States v. Goode,* 483 F.3d 676, 681 (10th Cir. 2007); *United States v. Orr*, 864 F.2d 1505, 1508-09 (10th Cir. 1988). Any error here is hardly plain.

Consent is a factual issue to be determined by the totality of the circumstances, not by per se rules. In other words, no one factor – including the

_____

[3]   Mr. Romero suggests that it would defy logic to believe that he would have granted consent under the circumstances: "[t]here is no logical reason to believe that he would [consent] if [the closet] contained cocaine." Aplt. Opening Br. at 15. However, the case law is replete with examples of individuals consenting to a search that later reveals evidence of contraband, attesting to the fact that people do not always behave logically. *See*, *e.g.*, *United States v. Sawyer*, 441 F.3d 890, 892 (10th Cir. 2006) (consensual search of defendant's business revealed stolen motorcycle engines), *cert. denied*, 127 S. Ct. 156 (2006); *United States v. Rosborough*, 366 F.3d 1145, 1148 (10th Cir. 2004) (consensual search of defendant's vehicle revealed 30 pounds of cocaine).

execution of a consent-to-search form – is dispositive. Indeed, the Supreme Court has twice rejected per se rules in determining the validity of a consent to search. *See Ohio v. Robinette*, 519 U.S. 33, 39-40 (1996) (rejecting rule requiring "police officers to always inform detainees that they are free to go before a consent to search may be deemed voluntary"); *Schneckloth v. Bustamonte*, 412 U.S. 218, 227, 248-49 (1973) (rejecting rule requiring individuals to be informed of their right to refuse consent). More specifically, citing *Robinette*, the Eighth Circuit concluded that a signed consent-to-search form was not a prerequisite for establishing the voluntariness of consent. *United States v. Carrate*, 122 F.3d 666, 670 (8th Cir. 1997). Accordingly, Mr. Romero's newly-spawned contention of error regarding the officers' failure to get his written consent is not plain, and we therefore will not consider it.

**B.    The District Court Did Not Clearly Err in Finding that Mr. Romero Voluntarily Consented to the Search of the Closet.**

Mr. Romero also challenges the district court's ruling that he voluntarily consented to the search claiming that: (1) he was in custody in handcuffs in the back seat of a patrol car; (2) he had been drinking heavily prior to the incident; and (3) he was deceived by the police officer who told him officers were looking for identification and did not mention any suspicion of drug activity.[4]

_____

[4]    On appeal, Mr. Romero does not argue that his consent was involuntary because of language barriers. Any "communication barrier" Mr. Romero refers to involves his allegation that he had been drinking heavily. Mr. Romero's

(continued...)

The government bears the burden of proving, by a preponderance of the evidence, that the individual voluntarily consented – "a burden that is not satisfied by showing a mere submission to a claim of lawful authority." *Florida v. Royer*, 460 U.S. 491, 497 (1983). The government must demonstrate that consent was given without duress or coercion, express or implied. *See United States v. Butler*, 966 F.2d 559, 562 (10th Cir. 1992). The question of whether an individual has voluntarily consented to a search is a question of fact that the district court must evaluate under the totality of the circumstances. *Robinette*, 519 U.S. at 39-40; *Schneckloth*, 412 U.S. at 226-27; *see also Cruz-Mendez*, 467 F.3d at 1265 (observing that voluntariness of consent is a question of fact which is reviewed under the highly deferential clearly-erroneous standard); *United States v. Sawyer*, 441 F.3d 890, 895 (10th Cir. 2006) ("[T]he federal test for determining the validity of consent to search requires a factual determination

_____

[4](...continued)
arguments regarding the need for an interpreter all bear on the issue of Sgt. Espinoza's credibility. It is only in his reply brief that Mr. Romero seems to argue that the language barrier provides a basis for finding involuntary consent. "Failure to raise an issue in the opening appellate brief waives that issue." *United States v. Black*, 369 F.3d 1171, 1176 (10th Cir. 2004). In any event, Mr. Romero's contention is unpersuasive. The district court specifically noted that "[a]lthough the defendant may not be completely fluent in English, the evidence persuades the court that the defendant understood the request, that he was able to communicate his thoughts to the officer, and he made a decision of his own free will to grant permission to search the closet for his identification." R. Vol. I, Doc. 25 at 7. These findings are not clearly erroneous. *See United States v. Contreras*, 372 F.3d 974, 977-78 (8th Cir. 2004) (finding that defendant's difficulties with English did not prevent him from voluntarily consenting to a search of his home).

based upon the totality of the circumstances of whether the consent was the product of an 'essentially free and unconstrained choice by [the] maker' or whether it was the product of 'duress or coercion, express or implied.'") (quoting *Schneckloth*, 412 U.S. at 225), *cert. denied*, 127 S. Ct. 156 (2006). Factors to consider within the totality of circumstances include:

- the threatening presence of several officers;
- the display or brandishing of weapons;
- some physical touching by an officer;
- use of aggressive language or tone of voice indicating that compliance with an officer's request is compulsory;
- prolonged retention of personal effects such as identification, plane or bus tickets;
- request to accompany officer to the station;
- interaction in a nonpublic place;
- absence of other members of the public;
- the administration of *Miranda* warnings;
- use of physical violence;
- oral threats;
- promises, inducements, deception, trickery;
- the physical and mental condition and capacity of the defendant; and
- whether the police informed defendant of the right to refuse consent.

*See Guerrero*, 472 F.3d at 790; *Sawyer*, 441 F.3d at 895; *United States v. Hernandez*, 93 F.3d 1493, 1500 (10th Cir. 1996).

Addressing Mr. Romero's first argument, the fact that Mr. Romero was in custody is not dispositive as to the voluntariness of his consent. *See United States v. Watson*, 423 U.S. 411, 424 (1976) ("[T]he fact of custody alone has never been enough in itself to demonstrate a coerced confession or consent to search."). "Consent to search may be voluntary, even though the consenting party

is being detained at the time consent is given." *United States v. Doyle*, 129 F.3d 1372, 1377 (10th Cir. 1997). *Accord United States v. Dozal*, 173 F.3d 787, 796 (10th Cir. 1999); *United States v. Soto*, 988 F.2d 1548, 1557 (10th Cir. 1993) ("Valid consent may be given by a person being detained."). A court must look to all the facts and circumstances to determine whether the consent to search was freely given by an individual under arrest. *See United States v. Shields*, 573 F.2d 18, 23 (10th Cir. 1978).

Applying the factors enumerated above, the district court found that although Mr. Romero was in custody at the time he gave consent, the totality of the circumstances did not warrant a finding that Mr. Romero's consent was coerced. Specifically, the court observed that:

> the defendant was on a public street in front of his home . . . , and the officers did not use any overt display of force or coercion to gain the consent. The interaction between the officer and the defendant was cordial and courteous at the time of the request. And although the officers did not inform the defendant that he had a right to refuse a search, the manner in which the officer sought consent conveyed that he was seeking the defendant's permission for a search and that the defendant was not obligated to give consent. Moreover, the evidence shows that the defendant is a competent adult who understood the circumstances and the nature of the officer's request.

R. Vol. I, Doc. 25 at 7. In our view, the district court properly considered the fact that Mr. Romero was in custody along with the rest of the circumstances in concluding that Mr. Romero voluntarily consented to the search.

Second, Mr. Romero argues that his heavy drinking prior to the incident

rendered his consent involuntary. The district court found that "despite testimony of the defendant and his girlfriend about how much alcohol the defendant drank prior to the incident, there is no credible evidence that defendant's ability to understand or make a voluntary decision was impaired to any significant degree by alcohol." R. Vol. I, Doc. 25 at 7. On appeal, Mr. Romero fails to show why this conclusion is clearly erroneous.

In *United States v. Gay*, 774 F.2d 368 (10th Cir. 1985), we held that the defendant voluntarily consented to the search of his glove box even though his drug intoxication made him slur his speech, stagger, sway, and use his vehicle to support himself. *Id*. at 377 (recognizing "different degrees of intoxication" where an individual "can be too intoxicated to operate a motor vehicle, but rational enough to understand requests and to give plausible explanations"). In this case, Mr. Romero understood and responded to Sgt. Espinoza's and Officer Boone's questions and even offered a narrative explaining why he was running down the street. Both officers also testified that they did not smell alcohol on Mr. Romero's breath and that Mr. Romero's actions and demeanor did not indicate that he had been drinking. Accordingly, the district court properly weighed the evidence and did not clearly err in finding Mr. Romero's consent to be voluntary, despite his alleged intoxication.

Third, Mr. Romero claims that Sgt. Espinoza's "deception" and "trickery" regarding the object of the search rendered his consent invalid. Aplt. Opening Br.

at 16-17.  When assessing the voluntariness of consent, the use of deception or trickery is one factor to be considered in the totality of the circumstances. *Sawyer*, 441 F.3d at 895.  However, under the facts present here, this factor is of no moment.

Sgt. Espinoza truthfully told Mr. Romero that he wanted to look for proof confirming his identity.  He simply did not go further and tell Mr. Romero he also was looking for evidence of drug-dealing.  Even if this omission could be construed as evincing deceit, it would not be the kind of deceit that would have the capacity on these facts to erode the strong foundation of Mr. Romero's otherwise voluntary consent.  *See United States v. White*, 706 F.2d 806, 807-08 (7th Cir. 1983) (holding that officer's subjective intent to search for money did not render involuntary a defendant's consent to search for drugs).  *Cf. United States v. Kimoana*, 383 F.3d 1215, 1224 (10th Cir. 2004) ("Although the officers executing the search were looking for weapons rather than the vehicle key, the subjective motivation of the officers executing the search is irrelevant.").[5]  Accordingly the district court did not commit clear error in its determination of voluntariness.

---

[5]     Mr. Romero's argument that Sgt. Espinoza was familiar with an individual by the name of "Anthony Romero," and therefore, had no need to confirm Mr. Romero's identity is belied by the fact that Mr. Romero steadfastly maintained that he was not Anthony Romero.  Moreover, even after finding the drugs, Sgt. Espinoza continued to look for identification bearing the name "Anthony Romero."

**C.** **The Officers Did Not Exceed the Scope of Mr. Romero's Consent in Opening up the Plastic Shopping Bag in the Closet.**

Mr. Romero also argues that Sgt. Espinoza exceeded the scope of any alleged consent when he opened an opaque shopping bag found in the closet.

"The scope of a search is generally defined by its expressed object." *Florida v. Jimeno*, 500 U.S. 248, 251 (1991). *Accord Kimoana*, 383 F.3d at 1223. Additionally, "the scope of the consent determines the permissible scope of the search." *United States v. Marquez*, 337 F.3d 1203, 1207 (10th Cir. 2003). *Accord United States v. West*, 219 F.3d 1171, 1177 (10th Cir. 2000). In determining the scope of the consent, courts apply an objective-reasonableness test: "[W]hat would the typical reasonable person have understood by the exchange between the officer and the suspect?" *Jimeno*, 500 U.S. at 251 (finding it objectively reasonable for police to conclude that general consent to search defendant's car for drugs included consent to search paper bag on floor of car which might reasonably have contained drugs). Moreover, consent to search for specific items includes consent to search those areas and containers that might reasonably contain those items. *Id*. Finally, whether a search remains within the boundaries of consent is a question of fact to be determined by the totality of circumstances, and a district court's findings will be upheld unless they are clearly erroneous. *See Kimoana*, 383 F.3d at 1223; *West*, 219 F.3d at 1177 ("The court determines from the totality of the circumstances whether a search remains within the

boundaries of the consent, viewing the evidence in the light most favorable to the government.").

In this case, a reasonable person would have understood the exchange between Sgt. Espinoza and Mr. Romero to mean that Mr. Romero was granting permission to search anywhere in the closet for identification. The plastic shopping bag discovered by Sgt. Espinoza in the closet reasonably could have contained a receipt or other identifying information. Mr. Romero disputes that one could reasonably believe that identifying information could be found where Sgt. Espinoza discovered the bag – that is, among folded (possibly clean) clothes. But we do not share Mr. Romero's doubt.

Sgt. Espinoza was feeling the pockets of the clothes when he found the bag. Clothing pockets reasonably could be viewed as possible locations of identifying information. *Cf. Marquez*, 337 F.3d at 1208-09 (holding it was objectively reasonable for police to conclude that the general consent to search defendant's recreational vehicle for drugs and guns included consent to search compartment under bench seat of vehicle where drugs and guns could reasonably have been stored); *United States v. Tirado*, 313 F.3d 437, 440 (8th Cir. 2002) (searching defendant's bedroom closet and bag hanging in the closet was not beyond scope of consent to search where defendant did not limit the scope of the search of his bedroom); *United States v. Ramstad*, 308 F.3d 1139, 1446-47 (10th Cir. 2002) (upholding officer's removal of speaker grill covers as not exceeding scope of

general consent to search car); *West*, 219 F.3d at 1178 (affirming district court's conclusion that consent given by defendant to search car for drugs and firearms reasonably included consent to search the trunk and the containers which could have contained either drugs or firearms). Accordingly, we conclude that the district court did not clearly err in finding that the search was within the scope of Mr. Romero's consent.

## III. CONCLUSION

We conclude that the district court did not commit clear error in finding that Mr. Romero unequivocally and voluntarily consented to the search and that the search did not exceed the scope of Mr. Romero's consent. Therefore, we **AFFIRM** the district court's judgment.

ENTERED FOR THE COURT

Jerome A. Holmes
Circuit Judge