**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**April 14, 2008**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

UNITED STATES OF AMERICA,

      Plaintiff - Appellee,

v.

OBED GONZALEZ,

      Defendant - Appellant.

No. 07-5076

(N.D. Oklahoma)

(D.C. No. CR-06-162-C)

**ORDER AND JUDGMENT**[*]

Before **KELLY**, **ANDERSON**, and **TYMKOVICH**, Circuit Judges.

Defendant and appellant Obed Gonzalez conditionally pled guilty to possession with intent to distribute 100 kilograms or more of marijuana, in violation of 21 U.S.C. § 841(a) and (b)(1)(B). He reserved the right to appeal the denial of his motion to suppress the marijuana and the district court's decision to hold Gonzalez accountable for an amount of marijuana seized one year prior to the instant offense. We affirm the denial of Gonzalez's motion to suppress and we affirm the sentence imposed.

---

[*]This order and judgment is not binding precedent except under the doctrines of law of the case, res judicata, and collateral estoppel. It may be cited, however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

## BACKGROUND

Oklahoma Highway Trooper Cody Hyde was monitoring traffic on Interstate 44 near Stroud, Oklahoma, on the evening of August 23, 2006. At approximately 11:40 p.m., Hyde stopped the Suburban van which Gonzalez was driving after observing a traffic violation (failure to signal prior to changing lanes). Hyde observed that Gonzalez was the sole occupant of the vehicle. Gonzalez handed his driver's license and a copy of the rental agreement for the Suburban to Hyde.

Hyde testified at the suppression hearing that Gonzalez was extremely nervous, looked exhausted and kept yawning. Gonzalez's hands were shaking and his voice cracked when he answered questions. His nervousness did not subside even after Hyde told Gonzalez that he (Gonzalez) would only receive a warning. While he was questioning Gonzalez, Hyde observed a road map on the front seat of the car, an overnight bag, several food wrappers, a cell phone and energy drink containers. The rental contract showed that the Suburban had been rented that day in New Mexico and was due back in New Mexico three days later—i.e., August 26. It also showed that the car had been rented by a third party, with Gonzalez listed as an authorized driver. When asked why he had not rented the vehicle, Gonzalez explained that he did not have a credit card.

Hyde asked Gonzalez to step out of the car and accompany him back to his patrol car. As Hyde passed the rear of the Suburban, he shined his flashlight into

the rear of the Suburban. He observed the luggage cover pulled over the cargo area and he saw the ends of two duffel bags and a trash bag with square-shaped packages. Trooper Hyde testified that he immediately identified the square packages as kilos of narcotics. The length of time Hyde shined his light into the Suburban was approximately one second.

While sitting in Hyde's patrol car, Hyde and Gonzalez discussed Gonzalez's travel plans. Gonzalez said he was going to Tulsa to visit a friend and that he would stay in Tulsa for two or three days. Gonzalez named his friend as Aaron Lyon, and he said he would be staying at Lyon's house if there was room. Gonzalez also told Trooper Hyde that he owned his own construction company. Hyde filled out the warning citation and asked Gonzalez to sign it. When Gonzalez handed the pen back to Hyde, Hyde observed Gonzalez's hand trembling. Trooper Hyde told Gonzalez he was free to go, but then asked if he could ask Gonzalez a few more questions. In response to the questions, Gonzalez said he was not transporting weapons or drugs in the car and he refused to give consent to search it.

Hyde then ran his drug-sniffing dog around the Suburban. The dog alerted to the car, indicating the presence of narcotics. A search of the car revealed 193 square-shaped bundles, weighing approximately 430 pounds, in the two duffel bags and trash bag in the back of the Suburban. Gonzalez was arrested. While he was being taken to jail, Gonzalez told Trooper Hyde that he expected to receive

$30,000 for this trip and that he had made $60,000 in 2005 by transporting narcotics.

Gonzalez filed a motion to suppress the marijuana, on the ground that Hyde did not have a reasonable articulable suspicion that illegal activity was occurring, so as to justify prolonging the detention once the warning citation had been issued and Gonzalez was told he could go on his way. In denying the motion to suppress, the district court stated the following:

> The Court finds credible Trooper Hyde's testimony that the defendant appeared nervous and was visibly shaken during the traffic stop. The Court finds that the audio tape of the traffic stop substantiates Trooper Hyde's testimony. Prior to Trooper Hyde discovering the narcotics in the Suburban, the trooper clearly advised the defendant that he was issuing only a warning ticket. However, the defendant's voice continued to sound strained when he spoke to the officer. The defendant offered very little conversation except for brief answers to direct questions asked by Trooper Hyde. Moreover, as the defendant was observing Trooper Hyde search his vehicle he was talking to an unidentified person on a cell phone or radio. In that conversation there was minimal change in the defendant's voice after he observed Trooper Hyde discover the marijuana in the Suburban. The unknown listener is heard commenting on several occasions that the defendant needed to "calm down." The audio tape substantiates Trooper Hyde's testimony that the defendant appeared nervous and anxious both before and after he discovered the narcotics in his vehicle.

> The Court finds credible Trooper Hyde's testimony that he observed the ends of duffle bags and black trash bags containing square bundles in the rear cargo area of the Suburban. Trooper Hyde's extensive specialized training in drug concealment and his extensive experience in thousands of traffic stops involving large scale drug trafficking lends credibility to Trooper Hyde's statement that he could detect this type of drug concealment by looking in the cargo area for as brief a time as one second.

-4-

Order at 5-6, R. Vol. I, doc 24. The court concluded that "Trooper Hyde's detention of defendant Obed Gonzales was supported by reasonable suspicion of illegal activity and the search of his vehicle was supported by probable cause." Id. at 9.

Gonzalez pled guilty and, in preparation for sentencing, the United States Probation Office prepared a presentence report ("PSR"). In the PSR, a total of 453 kilograms of marijuana were attributed to Gonzalez. This consisted of the approximately 403 pounds seized in the current transaction, as well as 597 pounds seized from a boat Gonzalez was towing the year before.[1] The PSR concluded

_____

[1]The PSR described the incident from the prior year as follows:

Consistent with his admission, on a previous occasion one year earlier, Gonzalez had been stopped in a similar incident. On August 22, 2005, Oklahoma Bureau of Narcotics Agent Ronnie Jackson observed a 1999 Ford F-350 pick-up truck bearing New Mexico license plates pulling a boat traveling eastbound on Interstate 40 following another vehicle too closely. Once a traffic stop was initiated, the driver of the vehicle, Gonzalez, handed agent Jackson his driver's license. The passenger, Roger Gomez, handed the registration papers to the agent. Both did so without being asked. The vehicle was registered to Gomez. Both men gave the agent conflicting stories regarding their travel plans and appeared nervous doing so. After Gonzalez was issued a warning citation, the agent then asked both men if there were firearms or narcotics in the pick-up truck. Both men denied and consented to a search of the pick-up truck. With the assistance of another agent, a search of the pick-up truck revealed no contraband. Upon removing the tarp of the boat, agents could smell the strong odor of raw marijuana. Both Gonzalez and Gomez were handcuffed. A locked compartment was located in the front of the boat. Gomez advised he did not know where the key to the compartment was. Agents forced the compartment opened and

(continued...)

that "based on these two similar incidents that were part of the same course of conduct, the defendant possessed a total of approximately 453 kilograms of marijuana."  PSR ¶ 11, R. Vol. II.  This yielded a base offense level of 28, which was then reduced by two points for acceptance of responsibility.  With a total offense level of 26 and a criminal history category of II, the advisory United States Sentencing Commission, Guidelines Manual ("USSG") sentencing range was seventy to eighty-seven months.  The district court sentenced Gonzalez to seventy-eight months' imprisonment.

Gonzalez appeals, arguing (1) the district court erred when it denied Gonzalez's motion to suppress on the ground that reasonable suspicion existed to prolong the detention of Gonzalez following a lawful traffic stop; and (2) the district court erred by including as relevant conduct under the advisory Guidelines an amount of marijuana seized from Gonzalez in a traffic stop one year earlier.

---

[1](...continued)
found 150 bundles of marijuana wrapped in tan colored packing tape, laundry detergent and clear plastic wrap. . . .  A total of 597 pounds of marijuana were confiscated.  Charges were never formally filed against Gonzalez.

PSR ¶ 10, R. Vol. II.

## DISCUSSION

### I. Denial of motion to suppress:

"In reviewing the denial of a motion to suppress, we accept the factual findings of the district court unless they are clearly erroneous. The ultimate determination of reasonableness under the Fourth Amendment is a question of law, which we review *de novo*." United States v. Contreras, 506 F.3d 1031, 1035 (10th Cir. 2007) (citation omitted). "The credibility of witnesses, the weight to be given evidence, and the reasonable inferences drawn from the evidence fall within the province of the district court." United States v. Williams, 403 F.3d 1203, 1206 (10th Cir. 2005).

There is no dispute that the initial traffic stop was valid. See United States v. Botero-Ospina, 71 F.3d 783, 787 (10th Cir. 1995) ("[A] traffic stop is valid under the Fourth Amendment if the stop is based on an observed traffic violation or if the police officer has reasonable articulable suspicion that a traffic or equipment violation has occurred or is occurring.") (en banc). Gonzalez does not claim that the initial stop for failure to properly signal while changing lanes was invalid.

However, "[o]nce an officer has returned the motorist's license and other papers and issued any citation he intends to give, he must usually allow [the motorist] to proceed on [his] way without additional questioning." Contreras, 506 F.3d at 1035. Any further detention of the motorist "must be justified by an

objectively reasonable and articulable suspicion of illegal activity based on the totality of the circumstances." Id. at 1036 (further quotation omitted).

We have stated that reasonable suspicion is a "particularized and objective basis for suspecting the particular person stopped of criminal activity." United States v. Guerrero, 472 F.3d 784, 787 (10th Cir. 2007). In determining the existence of reasonable suspicion, "we defer to trained law enforcement personnel, 'allow[ing] officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that 'might well elude an untrained person.'" Id. (quoting United States v. Arvizu, 534 U.S. 266, 273 (2002) (further quotation omitted)). Thus, the "evaluation is made from the perspective of the reasonable *officer*, not the reasonable *person*." Id. (further quotation omitted). We must not, however, "examine each factor adding up to reasonable suspicion individually," but, rather, we must "evaluate how convincingly they fit together into a cohesive, convincing picture of illegal conduct." Id.. The Supreme Court in Arvizu "rejected what it called a 'divide-and-conquer analysis,' noting that reasonable suspicion may exist even if 'each observation' is 'susceptible to an innocent explanation.'" Id. (quoting Arvizu, 534 U.S. at 274).

Cody testified at the suppression hearing that, prior to Gonzalez's refusal to allow him to search the Suburban, he thought he had reasonable suspicion to search, based on the totality of the following circumstances:

From the simple fact he was coming from a source city going to a source city traveling on a main drug courier highway. He had a third-party rental vehicle that was only rented for three days, obviously a quick turn around trip. Had the food wrappers and energy drinks. He looked exhausted. He had obviously been traveling nonstop since he left. I did not . . . see any luggage in the vehicle. And also the fact that he was extremely, extremely nervous.

Id. at 21. When asked if the bundles in the back of the car contributed to his suspicion, Cody said they did "[a]long with all of the other things." Id. Once the dog alerted to the Suburban, Cody had probable cause to search the car, which led to the discovery of the marijuana. See United States v. Williams, 403 F.3d 1203, 1207 (10th Cir. 2005) ("A canine alert gives rise to probable cause to search a vehicle.").

Some of the factors Trooper Hyde cited are of little value in establishing reasonable suspicion. We have stated that the "fact that the defendants were traveling from a drug source city . . . does little to add to the overall calculus of suspicion." Guerrero, 472 F.3d at 787-88. This is so because "[i]f travel between two of this country's largest population centers is a ground on which reasonable suspicion may be predicated, it is difficult to imagine an activity incapable of justifying police suspicion and an accompanying investigative detention. Our holding that *suspicious* travel plans can form an element of reasonable suspicion should not be taken as an invitation to find travel suspicious per se." United States v. Santos, 403 F.3d 1120, 1132 (10th Cir. 2005). Similarly, we attribute little value to Hyde's observation of food wrappers or a cell phone in the car:

"wrappers from fast food establishments strewn about a car may indicate slovenliness or the need to travel while eating, but do not themselves indicate a driver smuggling contraband." United States v. Bradford, 423 F.3d 1149, 1156 (10th Cir.2005). Further, cellular phones must be "outrightly dismissed as so innocent or susceptible to varying interpretations as to be innocuous." Id. at 1157.

On the other hand, "[w]e have noted numerous times that implausible travel plans can form a basis for reasonable suspicion." Contreras, 506 F.3d at 1036. "We have also credited the idea that drug couriers often use third-party rental cars." Id. (citing United States v. Williams, 271 F.3d 1262, 1270 (10th Cir. 2001)). Further, "[a]lthough we have found nervousness to be of only limited significance in determining whether reasonable suspicion exists, it does add to the overall calculus of suspicious behavior, especially when, as here, it is extreme." Contreras, 506 F.3d at 1036 (further quotation and citation omitted); see also United States v. Williams, 403 F.3d 1203, 1206-07 (10th Cir. 2005) (finding the officer had reasonable suspicion in part because defendant "was extremely nervous during his encounter with Trooper Hyde; his hands were shaking, his voice cracking, he could not sit still, and his heart was beating so fast that Trooper Hyde was able to see his chest jerk").

In this case, Gonzalez's travel plans, while not necessarily completely implausible, were unusual and suggestive of a very quick turn-around trip.

-10-

Further, a third party had rented the car and, although Gonzalez was listed as an approved driver, the actual renter was nowhere in sight. Trooper Hyde testified to Gonzalez's extreme nervousness, even after being told he would only receive a warning. Cf. United States v. Patterson, 472 F.3d 767, 779 (10th Cir. 2006) (noting that defendant's "nervousness throughout the stop, despite [the trooper's] assurances that he would only get a warning citation, further supports the jury's conclusion that he knowingly possessed the cocaine"), petition for cert. filed, (U.S. Apr. 24, 2007) (No. 06-10972).

Finally, Trooper Hyde testified that he actually saw square bundles underneath the cover in the back of the Suburban, which, to his trained and experienced eye, immediately suggested narcotics. Gonzalez argues it would have been impossible for Hyde to see those bundles, if the cover was pulled all the way toward the rear hatch of the Suburban, especially given that Hyde admittedly looked in with a flashlight for perhaps one second.[2] However, the district court specifically found Trooper Hyde's testimony on this point credible. It is not our role on appeal to re-examine credibility determinations.

In sum, although several of the factors upon which Trooper Hyde rested his finding that reasonable suspicion existed are entitled to little, if any, weight, and

---

[2]While the video of Hyde looking in the Suburban and then later opening the back of the vehicle is not a part of the record on appeal, the testimony below, as well as representations made at oral argument of this appeal, suggest that it is impossible to tell whether Hyde could see the bundles or not.

-11-

others may be, individually, equally as suggestive of innocent travel, the totality of the circumstances supports the conclusion that there was reasonable articulable suspicion to suspect criminal activity. The district court therefore correctly denied Gonzalez's motion to suppress.

**II. Other marijuana as relevant conduct:**

As indicated, Gonzalez had been arrested in 2005, a year before the arrest and conviction in this case. In that prior incident, he was stopped while driving a vehicle eastbound along Interstate 40. The vehicle belonged to the passenger, Roger Gomez. The car was towing a boat, in which was found 150 bundles of marijuana, totaling 597 pounds. Gonzalez was never charged, however, as the search of the boat was later determined to be illegal.

The PSR characterized the 2005 incident as relevant conduct under USSG §1B1.3 and used it to increase Gonzalez's base offense level under USSG §2D1.1. Gonzalez objected to the PSR's inclusion of the 2005 incident. The district court agreed with the PSR and the government and accordingly used the drug quantity from the 2005 incident to increase Gonzalez's base offense level. Gonzalez argues that was clearly erroneous.

While we now review sentences for procedural and substantive reasonableness, "whatever sentence the district court ultimately chooses, Gall [v. United States, 128 S. Ct. 586, 594 (2007)] emphasized that, as a matter of

-12-

procedural regularity, the 'starting point and the initial benchmark' for any sentencing decision must be a correctly calculated Guidelines sentencing range." United States v. Todd, 515 F.3d 1128 (10th Cir. 2008) (quoting Gall, 128 S. Ct. at [ ]). Thus, "on appellate review, our first task remains to 'ensure that the district court committed no significant procedural error, such as failing to calculate (or improperly calculating) the Guidelines range . . . [or] selecting a sentenced based on clearly erroneous facts.'" Id. at 1135-36 (quoting Gall, 128 S. Ct. at 597). "In determining whether the district court correctly calculated the recommended Guidelines range, we review *de novo* the district court's legal conclusions pertaining to the Guidelines and review its factual findings, including its determination of the quantity of drugs for which the defendant is held accountable under the Guidelines for clear error." Id. at 1135. Further, drug quantities used by the district court to arrive at the applicable Guidelines range "may be said to be clearly erroneous only when 'the district court's finding was without factual support in the record or we are left with the definite and firm conviction that a mistake has been made.'" Id. (quoting United States v. Dalton, 409 F.3d 1247, 1251 (10th Cir. 2005)).

For the drugs involved in the 2005 incident to qualify as relevant conduct for sentencing on the current crime, the two offenses (2005 and 2006 drug arrests) must be part of "the same course of conduct." USSG §1B1.3 (a)(2). Application note 9 to USSG §1B1.3 states as follows regarding "same course of conduct":

-13-

Offenses that do not qualify as part of a common scheme or plan may nonetheless qualify as part of the same course of conduct if they are sufficiently connected or related to each other as to warrant the conclusion that they are part of a single episode, spree, or ongoing series of offenses. Factors that are appropriate to the determination of whether offenses are sufficiently connected or related to each other to be considered as part of the same course of conduct include the degree of similarity of the offenses, the regularity (repetitions) of the offenses, and the time interval between the offenses. When one of the above factors is absent, a stronger presence of at least one of the other factors is required.

USSG §1B1.3 (n.9(B)). We conclude that the district court did not clearly err in including the drug quantity from the 2005 incident.

The two events were similar in that they both involved Gonzalez transporting large quantities of marijuana in bundles in the same general area in Oklahoma. Furthermore, Gonzalez admitted to Trooper Hyde that he had made $60,000 the previous year transporting marijuana and that he expected to make $30,000 from the offense of conviction. The PSR recounts that "[a]fter he was booked into the Creek County, Oklahoma, jail agents commented to Gonzalez that the load of marijuana he had been transporting was not very large. Gonzalez replied that 'I usually bring 600 pounds twice a month and about 12,000 pounds annually." PSR ¶ 9, R. Vol. II. Thus, by his own admission, Gonzalez routinely transported marijuana. "[W]e have specifically held that a defendant's admissions can in these circumstances serve as a proper basis of a court's drug quantity calculation under the Guidelines." Todd, 515 F.3d at 1135. The district

court's inclusion of the drug quantity from 2005 in calculating Gonzalez's Guidelines sentence was not clearly erroneous.

To the extent Gonzalez makes any challenge to the length of his sentence as substantively unreasonable, we conclude he has failed to rebut the presumption of reasonableness which we accord a properly calculated within-Guideline advisory sentence.

## CONCLUSION

For the foregoing reasons, we AFFIRM the denial of the motion to suppress and we AFFIRM the sentence.

ENTERED FOR THE COURT


Stephen H. Anderson
Circuit Judge