**Donald WILLIAMS, Appellant,**

v.

**The STATE of Texas, Appellee.**

**No. 09–99–454 CR.**

Court of Appeals of Texas, Beaumont.

Submitted Aug. 3, 2000.

Decided Sept. 13, 2000.

Paul D. Clayton, Orange, for appellant.

John Kimbrough, County Atty., Troy Johnson, Asst. County Atty., Orange, for State.

Before WALKER, C.J., BURGESS and STOVER, JJ.

## OPINION

RONALD L. WALKER, Chief Justice.

Appellant was indicted for having committed the state jail felony offense of Possession of Controlled Substance of less than a gram. Enhancement allegations contained in the indictment raised appel-

lant's punishment exposure to that of a second degree felony offender. *See* TEX. PEN. CODE ANN. § 12.42(a)(2)(Vernon Supp. 2000). Pursuant to a written motion to suppress evidence filed prior to trial, the trial court held an evidentiary hearing. At the conclusion of said hearing, the trial court denied the motion to suppress. Thereafter, appellant entered a plea of guilty to the offense and conditioned said plea on his ability to appeal the trial court's denial of the suppression motion. *See Young v. State*, 8 S.W.3d 656, 663 (Tex.Crim.App. 2000). As such, we have jurisdiction to entertain this appeal. *Id.* Appellant's lone issue before us contends the trial court erred in denying his motion to suppress evidence because said evidence was obtained during an unlawful search of appellant's person in violation of Article I, sec. 9 of the Texas Constitution and the Fourth and Fourteenth Amendments of the United States Constitution.[1]

■■■ We set out the facts as elicited by the parties during the suppression hearing. As always, we review the evidence in a light most favorable to the trial court's ruling. *Carmouche v. State*, 10 S.W.3d 323, 328 (Tex.Crim.App.2000). Since the trial court made no explicit findings of historical fact, we will assume the court made implicit findings of fact supported in the record that buttressed its conclusion. *Id.* We will defer to those implicit findings since credibility of the witnesses was involved, but we will review *de novo* the trial court's application of the relevant legal standards to the historical facts. *Id.*

■■■ On November 24, 1998, Officers Aaron Wasser and Shannon Meaux of the Orange Police Department observed a vehicle being operated on the streets of Orange County, Texas, with an inoperable license plate light. Appellant was identified as the driver and lone occupant of the vehicle by his valid driver's license. Appellant exited his vehicle and both officers approached him. Officer Meaux initially made contact and took possession of appellant's driver's license in order to run a check with the police dispatcher for any outstanding warrants. Officer Wasser then described the sequence of events that followed:

Q. [State's Attorney] Okay. And what did you do at the traffic stop after Officer Meaux made the initial contact and identification of the individual?

A. [Wasser] Okay. Officer Meaux made initial contact and retrieved his Texas driver's license. At that point in time, Officer Meaux displayed what I call a violation of officer safety. He turned his back to a violator and began to radio to dispatch a driver's license check, also a local outstanding warrant check on the subject.

Q. Okay. And what did you do at this point?

A. At that point in time, I observed Mr. Williams to be dressed in clothing that I thought was unusual for the weather temperature.

Q. And what do you mean by unusual for the temperature?

A. I was in short sleeves, and I believe Officer Meaux was also in short sleeves. This subject had on a heavy, black coat, also a toboggan on his head and—

---

1. Appellant also contends that the scope of the search exceeded any justification the officer might have had to search for his protection because "neither [officer] knew from the pat-down search, nor from the feel of the appellant's person, that he had a weapon on his person or something else." We disregard this contention because the record, taken in the light most favorable to the trial court's ruling, indicates that having felt the object in appellant's pocket, Officer Wasser only asked appellant what was in the pocket. It was appellant who undertook to take the matchbox out of his own pocket and open it, thereby exposing the cocaine to the officer's view. Appellant has provided us with no authority, and we know of none, that prevents an officer from merely asking a suspect what is in his [the suspect's] pocket after having conducted a proper *Terry* pat-down.

Q. Okay And did you at this point— and, so, at this point, what did you do involving Mr. Williams?

A. I conducted a pat-down of the subject's outer clothing for both my safety and for Officer Meaux's safety.

Q. And why did you feel that that was necessary for your and Officer Meaux's safety?

A. As I said, Officer Meaux committed what I call an officer safety violation, in my opinion. He turned his back. So, I'm the only officer speaking with the violator. It's normal routine whenever I do remove a subject or a violator from a vehicle or anybody, any occupant of a vehicle which is in a violator vehicle, when I make contact, to pat down their outer clothing for my safety.

Q. Okay. And is your concern there for any possible weapons that might be on his person?

A. That is correct.

Q. And did the way he was dressed contribute to your concern for your safety?

A. Most definitely, with the baggy clothing and the heavy coat. A weapon could easily be concealed within that type of clothing.

Q. Okay. And what about Mr. Williams' demeanor? Was there anything unusual in that that concerned you?

A. Usually a violator will be pretty much relaxed in speaking with them. Usually eye-to-eye contact will be made. Mr. Williams displayed what I call—I don't know if it's a phrase that has been coined by anybody else, but the thousand-yard stare or the fight-or-flight syndrome where, more or less, looking at the ground and the eyes are moving from right to left in a way of looking for maybe a possible way out.

Q. Okay. And, so, all of those factors together made you have concern for your safety?

A. Sure.

Q. Did he appear calm, nervous?

A. The signs were there—the signs of nervousness with the eyes bouncing from right to left and the staring, more or less, towards the ground.

During direct examination of Officer Wasser, the State introduced State's Exhibit 1, a videotape of the encounter between the two officers and appellant. It was played for the trial court. Appellant's trial counsel used the videotape extensively to cross-examine Wasser. We, too, have viewed the videotape. Pertinent portions of the cross-examination of Officer Wasser that are supported by the videotape [2] are reproduced as follows:

Q. [Trial Counsel] Now, from watching the video, it appears that as you're walking up to make initial contact with Mr. Williams, that is as Officer Meaux is going back calling in the driver's license number; is that right?

A. [Wasser] That is correct.

Q. And I noticed that as you were walking up and Officer Meaux was looking away you looked up and glanced at Mr. Williams for maybe two or three seconds, possibly; is that right? Do you recall that?

A. I do believe so. That is correct.

Q. Then as you got beside Mr. Williams and began speaking with him directly, you observed him for approximately five seconds or so before you asked him to raise his hands to pat him down. Is that a fair—

A. That is an accurate assumption.

Q. And you've testified for [State's Attorney] that that's because it's normal routine to do a pat-down search on any vehicle stop that you make; is that right?

A. Not any vehicle but most—oftentimes that is my practice.

. . . .

**2.** *See Carmouche,* 10 S.W.3d at 332, (videotape provided "indisputable visual evidence contradicting essential portions of [officer's] testimony").

Q. Is the nervousness what really cued you on patting down Mr. Williams?

A. A combination of the clothing, the nervousness, the time of night, and Officer Meaux turning his back. It was a combination of about five things.

Q. Now, this pat-down search that we're talking about, the *Terry* frisk search, it's designed primarily to discover guns, knives, clubs, and other weapons; is that true?

A. Sure, amongst other weapons.

Q. Right. Any hidden harmful weapon?

A. Sure. And there are weapons that are much smaller than the items that you did mention.

Q. Right. But there wasn't any indication before you started to put your hands on Mr. Williams of any weapon besides he just had baggy clothes and nervousness, right?

A. That is correct.

. . . .

A final point was made on re-direct examination of Officer Wasser:

Q. [State's Attorney] Okay. And Mr. Williams jumped out of his vehicle and approached you-all, correct, once the traffic—

A. [Wasser] That is correct. That also raises my concern for safety.

Q. And what does a person that you normally stop do when you pull up to their car? Do they stay in the car, or do they get out?

A. Probably 90 percent of the people I make contact with stay in the vehicle. They might not always show me their hands and that is the first thing I request but most do stay inside a vehicle.

Q. Okay. So, his leaving the vehicle is another reason that raised your concern?

A. Sure.

■ We begin where all cases involving the propriety of a pat-down search begin: *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). In *Carmouche*, the

Court of Criminal Appeals pointed out that *Terry* and its progeny have always carefully distinguished between the legal standard justifying the initial stop of an individual with the legal authority to subsequently conduct a "frisk" upon the individual stopped. *See Carmouche*, 10 S.W.3d at 329. In the instant case, appellant does not contest the initial stop for the traffic offense of driving with an inoperable license plate light. It is the subsequent frisk of appellant that is at issue. The exigencies which permit a "frisk" or *Terry* pat-down are generated strictly by a concern for the safety of the officers. *See Terry*, 392 U.S. at 25–27, 88 S.Ct. 1868, 20 L.Ed.2d at 908–09. In other words, even when the validity of the initial stop is not in question, the additional intrusive act of patting-down the individual is only justified where the officer can point to "specific and articulable facts which reasonably lead him to conclude that the suspect might possess a weapon." *Carmouche*, 10 S.W.3d at 329 [citing *Terry*, 392 U.S. at 26–27, 88 S.Ct. 1868, 20 L.Ed.2d at 908–09.]

Yet as much "reverence" that reviewing courts give to *Terry*, it is cited almost exclusively in the context of the reasonableness of the *officer's* actions in the face of an encounter with the citizen or the "suspect," as the individual is most often referred to. *Terry*, however, mainly involved having to strike the proper balance between the need for police to be able to conduct legitimate investigations without fear of deadly force being used against them, and the right of the citizen being "investigated" to be free from "a serious intrusion upon the sanctity of [his] person[.]" *Terry*, 392 U.S. at 17, 88 S.Ct. 1868, 20 L.Ed.2d at 903. What follows is the *Terry* Court's recognition of just exactly what protection the Fourth Amendment cloaks the citizen with when an encounter with police arises. It is language that even regular practitioners of criminal law do not often come across when finding references to *Terry v. Ohio* as set out in

state appellate opinions. We quote extensively from *Terry* so as to get the true measure of the "balancing" undertaken by the Court:

There is some suggestion in the use of such terms as "stop" and "frisk" that such police conduct is outside the purview of the Fourth Amendment because neither action rises to the level of a "search" or "seizure" within the meaning of the Constitution. We emphatically reject this notion. It is quite plain that the Fourth Amendment governs "seizures" of the person which do not eventuate in a trip to the station house and prosecution for crime— "arrests" in traditional terminology. It must be recognized that whenever a police officer accosts an individual and restrains his freedom to walk away, he has "seized" that person. And it is nothing less than sheer torture of the English language to suggest that a careful exploration of the outer surfaces of a person's clothing all over his or her body in an attempt to find weapons is not a "search." Moreover, it is simply fantastic to urge that such a procedure performed in public by a policeman while the citizen stands helpless, perhaps facing a wall with his hands raised, is a "petty indignity." It is a serious intrusion upon the sanctity of the person, which may inflict great indignity and arouse strong resentment, and it is not to be undertaken lightly.

*Id.* at 16–17, 88 S.Ct. 1868, 20 L.Ed.2d at 903 (footnotes omitted).

Our evaluation of the proper balance that has to be struck in this type of case leads us to conclude that there must be a narrowly drawn authority to permit a reasonable search for weapons for the protection of the police officer, where he has reason to believe that he is dealing with an armed and dangerous individual, regardless of whether he has probable cause to arrest the individual for a crime. The officer need not be absolutely certain that the individual is armed; the issue is whether a reasonably pru-

dent man in the circumstances would be warranted in the belief that his safety or that of others was in danger. And in determining whether the officer acted reasonably in such circumstances, due weight must be given, not to his inchoate and unparticularized suspicion or "hunch," but to the specific reasonable inferences which he is entitled to draw from the facts in light of his experience.

*Id.* at 27, 88 S.Ct. 1868, 20 L.Ed.2d at 909 (citations and footnote omitted).

Judging by recent cases where the issue focuses on the propriety of a *Terry* patdown, it would appear that so long as the officer involved utters the talismanic words "officer safety," the pat-down will held to be reasonable. Take, for example, the *Carmouche* Court's handling of the issue. We excerpt the brief bit of testimony and the Court's rationale in *Carmouche:*

During the course of cross-examination, [D.P.S. Trooper Kervin] Largent admitted that the search was motivated in part by a desire to search for the narcotics, but also asserted that he wanted to ensure that appellant was not armed:

[DEFENSE COUNSEL]: But you weren't concerned at that very moment about your protection, you had two officers with weapons—

[TROOPER LARGENT]: Well, Counselor, like I say, I'm always concerned because things happen and they happen quick.

[DEFENSE COUNSEL]: But when you told Mr. Carmouche that you were doing it for your protection, you really weren't, you were doing it so you could see if he had any contraband on his person; right?

[TROOPER LARGENT]: I was doing it for protection, checking him also for the narcotics, both.

. . . .

Judging the evidence in a light most favorable to the trial court's ruling, the evidence supports a finding that Largent was concerned for his safety when he

conducted the frisk. Moreover, such a belief was objectively reasonable in light of the circumstances. First, we note that "roadside encounters between police and suspects are especially hazardous." *Michigan v. Long,* 463 U.S. 1032, 1049, 103 S.Ct. 3469, 3481, 77 L.Ed.2d 1201 (1983). More importantly, the *Terry* Court suggested that a police officer's reasonable belief that a suspect is armed and dangerous may be predicated on the nature of the suspected criminal activity. *See Terry,* 392 U.S. at 27–28, 88 S.Ct. at 1868 (finding officers could reasonably assume that offense of robbery would involve use of weapons, although officer did not observe a weapon or any physical indication of a weapon).

In the instant case, Largent stopped appellant pursuant to an articulable suspicion that appellant was trafficking in cocaine. Based on this limited knowledge of appellant's suspected activities, the officers justifiably approached appellant with caution. It was not unreasonable to conduct a limited search for weapons in these circumstances. "Since weapons and violence are frequently associated with drug transactions, the officers reasonably believed that the individual [ ] with whom they were dealing [was] armed and dangerous." *United States v. Brown,* 913 F.2d 570, 572 (8th Cir.1990) (citing *United States v. Oates,* 560 F.2d 45, 62 (2d Cir.1977))[.]

*Carmouche,* 10 S.W.3d at 329–30.

It is obvious in the instant case that Officer Wasser was not presented with the type of "suspected criminal activity" [inoperable license plate light] that would rise to the level of implicit danger present in both *Terry* [robbery] and *Carmouche* [cocaine trafficking] so as to permit Wasser to *reasonably* believe that appellant was presently armed and dangerous. Nevertheless, as set out above, the United States Supreme Court has consistently recognized that investigative detentions involving individuals in vehicles are especially fraught with danger to police officers. *See*

*Maryland v. Wilson,* 519 U.S. 408, 413, 117 S.Ct. 882, 137 L.Ed.2d 41, 47 (1997); *Michigan v. Long,* 463 U.S. 1032, 1047–48, 103 S.Ct. 3469, 77 L.Ed.2d 1201, 1218 (1983); *Pennsylvania v. Mimms,* 434 U.S. 106, 110, 98 S.Ct. 330, 54 L.Ed.2d 331, 336 (1977); *Adams v. Williams,* 407 U.S. 143, 146, 92 S.Ct. 1921, 32 L.Ed.2d 612, 617 (1972). The majority opinion in *Maryland v. Wilson* cites the following alarming statistics: "In 1994, alone, there were 5,762 officer assaults and 11 officers killed during traffic pursuits and stops. Federal Bureau of Investigation, Uniform Crime Reports: Law Enforcement Officers Killed and Assaulted 71, 33 (1994)." 519 U.S. at 413, 117 S.Ct. 882, 137 L.Ed.2d at 47. Recall that part of the *Terry* balancing test, as set out above, includes the proviso: "And in determining whether the officer acted reasonably in such circumstances, due weight must be given ... to the specific reasonable inferences which he is entitled to draw from the facts *in light of his experience.*" *Terry,* 392 U.S. at 27, 88 S.Ct. 1868, 20 L.Ed.2d at 909 (emphasis added).

Thus, we are placed on a rather precarious perch regarding the nature of the facts in the instant case. By the plain language in *Terry* and *Carmouche,* Officer Wasser's belief that appellant was "presently armed and dangerous" was *unreasonable.* On the other hand, we have great difficulty in saying that Officer Wasser's admitted usual practice of patting-down virtually everyone he encounters during routine traffic stops is, "in light of his experience," unreasonable. It is common knowledge that America is awash in a sea of handguns, and the inherent danger to police officers when confronting individuals following "routine" traffic stops is certainly not lost on this Court. While we cannot say that Officer Wasser's belief of appellant's present dangerousness, under the *Terry* and *Carmouche* "reasonableness" construct, was valid, we are not going to second guess an officer who has legitimately made a stop for a traffic violation, without a hint

of pretext, and find he acted unreasonably in patting the motorist down for the officer's protection. Therefore, in light of his experience as a patrol officer and a field training officer, Officer Wasser's actions in patting appellant down for his safety and the safety of Officer Meaux were reasonable notwithstanding the fact that at the time the pat-down took place there was no indication appellant was "armed and presently dangerous." *Terry*, 392 U.S. at 30, 88 S.Ct. 1868, 20 L.Ed.2d at 911. This holding also provides the deference due any credibility findings by the trial court as well as to its implicit findings of fact. We find no violation of either the Fourth Amendment to the United States Constitution or of Article I, section 9 of the Texas Constitution.[3] Appellant's lone issue is overruled. The judgment and the sentence of the trial court are affirmed.

AFFIRMED.

3. *See Hulit v. State*, 982 S.W.2d 431, 436 (Tex.Crim.App.1998) ("It is our holding that Article I, Section 9 of the Texas Constitution contains no requirement that a seizure or search be authorized by a warrant, and that a seizure or search that is otherwise reasonable will not be found to be in violation of that section because it was not authorized by a warrant.")