**Opinion filed April 30, 2020**



## In The

# Eleventh Court of Appeals

_____

## No. 11-18-00053-CR

_____

## AMANUEL GEBRENGUS ATSEMET, Appellant

## V.

## THE STATE OF TEXAS, Appellee

**On Appeal from the 385th District Court**

**Midland County, Texas**

**Trial Court Cause No. CR49712**

### M E M O R A N D U M   O P I N I O N

The jury convicted Amanuel Gebrengus Atsemet of the offense of possession of more than four ounces but less than five pounds of marihuana. The trial court assessed Appellant's punishment at confinement for two years in a state jail facility. We affirm.

In the first of five issues on appeal, Appellant contends that the trial court erred when it denied his motion to "suppress the marijuana discovered from the search of the Vehicle as such evidence was seized during an illegal *Terry* stop and

without a warrant in violation of TEX. CODE CRIM. PROC. art. 38.23." In his second issue on appeal, Appellant contends that, because the police did not have reasonable suspicion to conduct a *Terry* frisk, the trial court erroneously admitted evidence of money found on Appellant's person as a result of the frisk. Appellant argues, in his third issue on appeal that the trial court erred when it overruled his objections to irrelevant testimonial evidence under Rule 402 of the Texas Rules of Evidence. In his fourth issue on appeal, Appellant asserts that the trial court erred when it denied his motion for new trial. Finally, in his fifth issue on appeal, Appellant challenges the sufficiency of the evidence to support his conviction.

Appellant first filed a pretrial motion to suppress evidence that he claimed was illegally obtained. He then amended that motion. The trial court conducted a pretrial hearing on the amended motion and denied it.

At the time of this offense, Sergeant Sean Sharp was a narcotics unit supervisor with the Midland Police Department. On the date of the offense, Sergeant Sharp was working in his office when he received a call from his older brother, Jason Sharp. Jason told Sergeant Sharp that, as he traveled on Highway 80 into Midland, he had passed a Chrysler 300 and that, as he passed the vehicle, he saw a backseat passenger who appeared to be smoking marihuana and passing it to the occupants in the front seat. The vehicle bore Colorado license plates. In Midland, Highway 80 is also Wall Street.

The fact that the vehicle had Colorado license plates particularly piqued Sergeant Sharp's interest because, "[d]ue to at least partial legalization of marijuana in Colorado, we frequently see marijuana being brought in from Colorado." On the date of this offense, Sergeant Sharp had been with the Midland Police Department for almost fourteen years. As a part of his duties, he supervised four narcotics detectives.

After Jason phoned him, Sergeant Sharp left his office and went to the area where Jason had seen the vehicle, and he began to look for it. Sergeant Sharp found a vehicle that met the description of the vehicle that Jason had described. In addition to the driver, there was a passenger in the front seat and one in the backseat.

When Sergeant Sharp located the vehicle, he called Sergeant Ed Marker of the Midland Police Department and told him "to try and conduct a traffic stop on the vehicle." When he saw Sergeant Marker arrive in a marked patrol unit, Sergeant Sharp "backed off and maintained eyes on the situation."

Sergeant Marker followed the vehicle, observed that the driver failed to signal 100 feet prior to a lane change, and initiated a traffic stop. As Jason had reported, the vehicle had three occupants: the driver, a passenger in the front seat, and another passenger in the backseat. A dash-cam recording of the events was admitted into evidence.

Throughout his interactions with the occupants, Sergeant Marker did not smell marihuana coming from the vehicle. When Sergeant Marker was following the vehicle, the windows were up, but when he approached the vehicle after he had stopped it, all four windows were down. On the dash-cam recording, when Sergeant Marker was commenting on the window situation, he noted that the wind was blowing that day.

When Sergeant Marker approached the vehicle, he noticed that the driver "had a GPS pulled up on his phone like he was looking for . . . directions for somewhere." Sergeant Marker asked the occupants where they were headed. The driver first responded, "South Street," and when Sergeant Marker asked where on South Street, the driver answered, "Cottonwood." Because the two streets neither intersected nor were they located close to each other, Sergeant Marker felt that the answer to his question made no sense.

Sergeant Marker also saw some clothing in the backseat of the vehicle, and he asked the occupants whether they were traveling. Sergeant Marker received inconsistent responses. One of the occupants explained that they were in town for a concert or to attend a concert. As far as Sergeant Marker was concerned, "[t]here had just been some discrepancies in the stories."

During his initial contact with the occupants of the vehicle, Sergeant Marker discovered that the driver and the front-seat passenger both had Georgia driver's licenses. Appellant informed Sergeant Marker that he did not have his driver's license with him. Appellant did, however, give Sergeant Marker his full name and date of birth. He told Sergeant Marker that he was from Colorado and that he had rented the vehicle from Enterprise. Sergeant Marker then returned to his patrol unit to run the standard checks on the vehicle and its occupants.

When Sergeant Marker first tried to run a records check, the dispatcher told him to "stand by." Through no fault attributable to Sergeant Marker, it took almost twenty minutes to complete the original records check.

Ultimately, Sergeant Marker confirmed that the occupants of the vehicle had valid driver's licenses and that no warrants were outstanding for them. Sergeant Marker also determined that the vehicle was registered to E.A. Holdings, "which is Enterprise rental car." At the hearing on the motion to suppress, the State's attorney asked Sergeant Marker, "And having worked narcotics, is there anything significant to you about it being a rental car and it being from Colorado, did you have any unique knowledge about the current situation?" Sergeant Marker answered, "[W]e've worked a lot of cases where drugs, specifically marijuana, is trafficked here from Colorado." At the time, Sergeant Marker was a twenty-three-year veteran of the Midland Police Department; he had served as a narcotics detective for thirteen of those years.

4

Within about twenty seconds after the records check was returned, because Appellant was the person who had rented the vehicle, Sergeant Marker asked him to get out of the vehicle so that he could talk to him and ask for consent to search the vehicle. After Appellant was out of the vehicle, Sergeant Marker performed a pat-down for officer safety. During the course of the pat-down, Sergeant Marker noticed what felt like a "big wad of money" in Appellant's pocket; Sergeant Marker retrieved the money. Appellant told Sergeant Marker that there was about $3,000 in the "big wad of money" and that he had earned it from his performance as the opening act at the concert to which they had earlier referred. Appellant declined to consent to a search of the vehicle. A subsequent search of the other occupants revealed nothing of note.

Sergeant Marker called in a request for a canine unit to come to the scene of the stop. He also requested a criminal history check on all three occupants of the vehicle. According to Sergeant Marker, the return of the criminal history check revealed that, within the last "month or two," Appellant had been charged with possession of a controlled substance.

After the canine unit arrived, Officer Jake Owens, a canine officer, notified Sergeant Marker that his dog had alerted first on the driver's side door of the vehicle. The dog also alerted on the center console of the vehicle, the trunk, and the backseat floorboard. Sergeant Marker felt that, at this point, he had probable cause to search Appellant's rental car.

The subsequent search of the vehicle revealed no contraband in the passenger compartment of the vehicle. However, the officers found two "Pelican" cases in the trunk of the vehicle; they were padlocked.[1] Although "[the occupants of the vehicle] said that it was their musical equipment," Officer Owens's dog alerted on the cases.

---

[1]"Pelican cases are molded plastic containers that seal with an airtight and watertight gasket." https://en.wikipedia.org/wiki/Pelican_Products (accessed on April 29, 2020 at 12:05 p.m.).

5

Another dog from another canine unit that had come to the scene alerted on various parts of the vehicle, and it also alerted on the smaller of the two Pelican cases. After the dogs alerted on the cases, the occupants then claimed that the cases belonged to someone else and that that person had the keys to the cases. However, the keys were later found in the vehicle in a book bag that belonged to the front-seat passenger.

Sergeant Sharp had joined the other officers at the scene by this time, and after the canines alerted on the cases, Sergeant Sharp used bolt cutters to cut the locks and open the cases. The cases contained 4.88 pounds of marihuana, a large amount of currency, sandwich bags, a digital scale, a vacuum sealer, a firearm, and ammunition; there was no musical equipment.

All three occupants of the vehicle were arrested, taken to the police department, and charged with possession of marihuana. The record does not reflect whether Sergeant Marker ever ticketed the driver for the traffic violation or whether he ever returned the driver's licenses to the other two occupants of the vehicle.

The driver and the front-seat passenger insisted that the marihuana was theirs, not Appellant's. Keyon Shakur Ponder, the front-seat passenger, testified before the jury that the marihuana found during the search belonged to him and Hezekiah Walker, the driver of the vehicle. Prior to Appellant's trial, Ponder and Walker both pleaded guilty to possession of marihuana. Nevertheless, after it had heard all the evidence, the jury convicted Appellant of the offense of possession of marihuana.

After the jury had found him guilty and after the trial court had assessed punishment, Appellant filed a motion for new trial in which he asserted only that the evidence was insufficient to support the conviction. The trial court denied the motion.

We will first consider Appellant's fifth issue in which he contends that the evidence was insufficient to support his conviction. Specifically, Appellant argues

6

that the evidence introduced at trial was insufficient to affirmatively link him to the marihuana found in the vehicle.

To determine whether the evidence is sufficient to support a conviction, we review all the evidence in the light most favorable to the verdict and determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Polk v. State*, 337 S.W.3d 286, 287 (Tex. App.— Eastland 2010, pet. ref'd); *see also Jackson v. Virginia*, 443 U.S. 307 (1979). Our review includes consideration of evidence that is inadmissible. *Soliz v. State*, 432 S.W.3d 895, 900 (Tex. Crim. App. 2014). We measure the sufficiency of the evidence by "the elements of the offense as defined by the hypothetically correct jury charge" for the case. *Morgan v. State*, 501 S.W.3d 84, 89 (Tex. Crim. App. 2016) (quoting *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997)).

The jury is the sole judge of the credibility and weight to be attached to the testimony of witnesses and may draw reasonable inferences from the facts, so long as the evidence presented at trial supports those inferences. *Temple v. State*, 390 S.W.3d 341, 360 (Tex. Crim. App. 2013) (citing *Jackson*, 443 U.S. at 319). When the evidence contains facts that support conflicting inferences, we presume that the jury resolved those conflicts in favor of the verdict, and we therefore defer to that determination. *Brooks v. State*, 323 S.W.3d 893, 922 (Tex. Crim. App. 2010). We may not reweigh or reevaluate the credibility of the evidence and substitute our own judgment for that of the jury. *Id.*; *see also Braughton v. State*, 569 S.W.3d 592, 608 (Tex. Crim. App. 2018).

A person commits the state jail felony offense of possession of marihuana if he "knowingly or intentionally possesses a useable quantity of marihuana" in the amount of "five pounds or less but more than four ounces." TEX. HEALTH & SAFETY CODE ANN. § 481.121(a), (b)(3) (West 2017).

7

To convict Appellant of possession of marihuana as charged in this case, the State had to prove beyond a reasonable doubt that Appellant exercised control, management, or care over the contraband and that Appellant knew the matter possessed was contraband. *Evans v. State*, 202 S.W.3d 158, 161 (Tex. Crim. App. 2006); *Poindexter v. State*, 153 S.W.3d 402, 405 (Tex. Crim. App. 2005). Whether direct or circumstantial, the evidence must establish that Appellant's connection with the marihuana was more than fortuitous. *Evans*, 202 S.W.3d at 161. Mere presence alone, without more, is insufficient to establish control, management, or care over the contraband. *Id.* at 162. However, other evidence, either direct or circumstantial, combined with presence at a place where contraband is found may establish the issue as to actual care, custody, or control of the contraband. *Id.*

Factors that "may circumstantially establish the legal sufficiency of the evidence to prove a knowing 'possession'" beyond a reasonable doubt include: (1) the defendant's presence when a search is conducted; (2) whether the contraband was in plain view; (3) the defendant's proximity to and the accessibility of the contraband; (4) whether the defendant was under the influence of narcotics when arrested; (5) whether the defendant possessed other contraband or narcotics when arrested; (6) whether the defendant made incriminating statements when arrested; (7) whether the defendant attempted to flee; (8) whether the defendant made furtive gestures; (9) whether there was an odor of contraband; (10) whether other contraband or drug paraphernalia were present; (11) whether the defendant owned or had the right to possess the place where the drugs were found; (12) whether the place where the drugs were found was enclosed; (13) whether the defendant was found with a large amount of cash; and (14) whether the conduct of the defendant indicated a consciousness of guilt. *Id.* at 162 n.12.

The above factors do not constitute a litmus test, they "are simply some factors which may circumstantially establish the legal sufficiency of the evidence." *Id.*

8

Additionally, it is "not the number of links that is dispositive, but rather the logical force of all of the evidence, direct and circumstantial." *Id.* at 162. Thus, we must examine each case on its own facts. *Whitworth v. State*, 808 S.W.2d 566, 569 (Tex. App.—Austin 1991, pet. ref'd). The "logical force of all of the evidence, direct and circumstantial," is dispositive—not the number of factors or "links" present. *Evans*, 202 S.W.3d at 162.

Appellant argues that there are numerous factors to indicate that Appellant did not possess the marihuana: the marihuana was enclosed in locked cases inside the trunk of the vehicle, not in plain view or in close proximity to Appellant; Appellant did not have the keys to the cases and therefore lacked immediate access to the marihuana; the officers did not smell marihuana coming from Appellant's person and did not discover any narcotics, marihuana, or drug paraphernalia on his person; Appellant did not attempt to flee and made no furtive gestures; and Appellant did not appear nervous or concerned with the canine sniff or the subsequent search of the vehicle. Appellant claims that his recording of the events on his cell phone is indicative of his lack of joint control over the marihuana. Appellant also points to the fact that the other occupants claimed their exclusive ownership of the marihuana and ultimately pleaded guilty.

The State, on the other hand, emphasizes Appellant's conduct as indicative of consciousness of guilt and as an important connection between Appellant and the marihuana. One of the occupants used a "drug dealer idiom" to refer to money when he asked Appellant "how many babies" Appellant had "in there," to which Appellant replied, "three or four thousand." The fact that the vehicle was rented to Appellant is a strong link between Appellant and the marihuana found inside it, regardless of whether he was driving the vehicle at the time of the stop. The $3,000 in cash in Appellant's pocket serves as another link between Appellant and the marihuana. Again, nothing of that nature was found on either of the other occupants. The

amount—4.88 pounds—of marihuana discovered in Appellant's rented vehicle, along with cash, a weapon, ammunition for that weapon, a scale, vacuum sealer, and sandwich bags also indicate an affirmative link between Appellant and the marihuana. We agree with the State that the logical force of this evidence raises a reasonable inference that Appellant knowingly had control, management, or care over the marihuana.

Though the facts may support alternative inferences, we defer to the jury's determinations on the weight and credibility of the evidence and its conclusion that the circumstances linked Appellant to the marihuana. We hold that a rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. Therefore, we hold that the evidence is sufficient to support Appellant's conviction. We overrule Appellant's fifth issue.

In Appellant's fourth issue, he argues that the trial court erred when it denied his motion for new trial. We review a trial court's ruling on a motion for new trial for abuse of discretion. *State v. Herndon*, 215 S.W.3d 901, 906 (Tex. Crim. App. 2007). As the sole ground presented in his motion, Appellant asserted that the evidence was insufficient to support his conviction. We have held that the evidence was sufficient. The trial court did not abuse its discretion when it denied Appellant's motion for new trial. We overrule Appellant's fourth issue.

We now take up Appellant's first issue in which he contends that the trial court erred when it "fail[ed] to suppress the marijuana discovered from the search of the Vehicle as such evidence was seized during an illegal *Terry* stop and without a warrant in violation of TEX. CODE CRIM. PROC. art. 38.23." In his argument under this issue, Appellant asserts that the traffic stop was unreasonable in duration, and he also claims that Sergeant Marker did not have reasonable suspicion to continue his detention of Appellant, or his rented vehicle, once the purpose of the traffic stop had ended.

10

We review a trial court's ruling on a motion to suppress under a bifurcated standard of review. *Lerma v. State*, 543 S.W.3d 184, 189–90 (Tex. Crim. App. 2018). We afford almost total deference to the trial court's determination of historical facts. *Id.* at 190 ("At a motion to suppress hearing, the trial judge is the sole trier of fact and judge of credibility of witnesses and the weight to be given to their testimony."). We review de novo whether the facts are sufficient to give rise to reasonable suspicion in a case. *Id.*

When the record is silent as to the reasons for the trial court's ruling, as in the case before us, we infer the necessary fact findings that would support that ruling if the evidence, viewed in the light most favorable to the trial court's ruling, supports those findings. *State v. Garcia-Cantu*, 253 S.W.3d 236, 241 (Tex. Crim. App. 2008); *see Wiede v. State*, 214 S.W.3d 17, 25 (Tex. Crim. App. 2007). We will sustain the trial court's ruling on a motion to suppress if it is correct under any applicable theory of law. *Lerma*, 543 S.W.3d at 190.

The Fourth Amendment guarantees protection against unreasonable searches and seizures. The temporary detention of individuals by the police to address traffic violations constitutes a seizure within the meaning of the Fourth Amendment and must be reasonable. *Whren v. United States*, 517 U.S. 806, 809–10 (1996); *Kothe v. State*, 152 S.W.3d 54, 62–63 (Tex. Crim. App. 2004).

There are two prongs involved in a Fourth Amendment analysis in this context. *Lerma*, 543 S.W.3d at 190. First, the action of the officer must be justified at its inception. *Id.* Appellant presents no argument that the traffic stop was other than justified. Therefore, we will proceed with our analysis of the second prong.

The second prong of our analysis involves a determination as to whether "the search and seizure were reasonably related in scope to the circumstances that justified the stop in the first place." *Id.* A stop that exceeds the time necessary "to handle the matter for which the stop was made violates the Constitution's shield

11

against unreasonable seizures." *Rodriguez v. United States*, 575 U.S. 348, 350 (2015); *see Lerma*, 543 S.W.3d at 190. Whether a detention that extends the duration is reasonable depends upon whether law enforcement officers "diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the defendant." *United States v. Sharpe*, 470 U.S. 675, 686 (1985).

There is no rigid time frame that governs a temporary detention. *Id.* at 685–86. "[C]ommon sense and ordinary human experience must govern over rigid criteria." *Id.* at 685. Reasonableness is the touchstone of the Fourth Amendment. *Martinez v. State*, 500 S.W.3d 456, 465 (Tex. App.—Beaumont 2016, pet. ref'd).

Although Appellant does not dispute the validity of the initial traffic stop, he does contend that the traffic stop lasted too long. Appellant's contention is based upon times documented by the time stamp shown on the dash-cam video. The video shows that Sergeant Marker began to follow Appellant's vehicle at 11:48 a.m. and that he initiated the traffic stop less than one minute later. By 12:08:03 p.m., Sergeant Marker had decided to ask Appellant to exit the vehicle. The video also shows that, by 12:08:42 p.m., the computer check had come back clear as to all occupants.

We take Appellant's position to be that the traffic stop should have been completed at that point and that Sergeant Marker should have decided whether to ticket the driver for the traffic offense. Instead, Sergeant Marker asked Appellant to get out of the vehicle, patted him down, called for a canine unit, and ran another computer check. Appellant argues that the canine unit did not arrive until forty-five minutes after Sergeant Marker originally stopped Appellant's vehicle and that that is unreasonable. In his brief, Appellant suggests that, even if the detention did not exceed its permissible limits, Sergeant Marker did not have reasonable suspicion to extend the duration of the detention and call for a canine sweep.

12

During a traffic stop, officers may appropriately make "ordinary inquiries incident to [the traffic] stop." *Rodriguez*, 575 U.S. at 355 (alteration in original) (quoting *Illinois v. Caballes*, 543 U.S. 405, 408 (2005)). It is proper for an officer to detain an individual in order to request a driver's license, insurance papers, information on the ownership of the vehicle, the driver's destination, and the purpose of the trip, and an officer may also run a check for outstanding warrants. *Id.*; *Powell v. State*, 5 S.W.3d 369, 377 (Tex. App.—Texarkana 1999, pet. ref'd). If the officer "can complete traffic-based inquiries expeditiously, then that is the amount of 'time reasonably required to complete'" the mission of the stop; "a traffic stop 'prolonged beyond' that point is 'unlawful.'" *Rodriguez*, 575 U.S. at 357 (quoting *Caballes*, 543 U.S. at 407).

Relative to extensions beyond the time necessary to complete the mission of the traffic stop, there is a caveat to the above principles. Once the official tasks of a traffic stop have come to an end, the officer may not embark on inquiries unrelated to the purpose of the stop *unless* the "officer develops reasonable suspicion that the driver or an occupant of the vehicle is involved in criminal activity." *Lerma*, 543 S.W.3d at 191. To determine, then, whether the duration of the traffic stop in this case was reasonable, we must determine whether, objectively, Sergeant Marker developed sufficient reasonable suspicion to detain Appellant beyond the time reasonably necessary to conduct the traffic stop.

Reasonable suspicion exists when an officer has specific, articulable facts, in light of his experience and personal knowledge, taken together with rational inferences from those facts, that would lead the officer to reasonably suspect that a particular person has engaged in, is presently engaging in, or soon will engage in criminal activity. *Garcia v. State*, 43 S.W.3d 527, 530 (Tex. Crim. App. 2001); *Hoag v. State*, 728 S.W.2d 375, 380 (Tex. Crim. App. 1987). When we evaluate whether reasonable suspicion exists, we consider the totality of the circumstances.

13

*Garcia*, 43 S.W.3d at 530. This includes "both the content of information possessed by the police and its degree of reliability." *Alabama v. White*, 496 U.S. 325, 330 (1990) ("Both factors—quantity and quality—are considered in the . . . 'whole picture' . . . that must be taken into account when evaluating whether there is reasonable suspicion." (quoting *United States v. Cortez*, 449 U.S. 411, 417 (1981))).

We are to review the totality of the circumstances from an objective standpoint. *Derichsweiler v. State*, 348 S.W.3d 906, 914 (Tex. Crim. App. 2011). By "objective standpoint," we mean that we disregard an officer's subjective intent and look to see whether the basis for the detention was objectively justifiable. *Ramirez-Tamayo v. State*, 537 S.W.3d 29, 36 (Tex. Crim. App. 2017). We are also to consider the premise that an officer may rely on his experience and training to reach conclusions. *Id.*

Because there are no express findings of fact, we will examine the "evidence in the light most favorable to the trial court's ruling and assume the trial court made implicit findings of fact supported by the record. We will sustain the ruling of the trial court if it is correct under any applicable theory of law." *Lerma*, 543 S.W.3d at 190. We will perform a de novo review as to whether those facts are sufficient to form reasonable suspicion. *Id.*

Sergeant Marker observed the driver of the vehicle execute a lane change without signaling 100 feet in advance. *See* TEX. TRANSP. CODE ANN. § 545.104(b) (West 2011). As we have stated, there is no argument that Sergeant Marker did not have probable cause for the traffic stop. That the traffic stop was pretextual is of no consequence. *See Whren*, 517 U.S. at 813.

After he initiated the traffic stop, Sergeant Marker conducted the ordinary traffic-based inquiries. Sergeant Marker asked the occupants where they were going and whether they were traveling, and he requested and obtained information about the vehicle and its occupants. Sergeant Marker asked for a computer check on that

14

information to determine whether any outstanding warrants existed against the occupants. Through no fault of Sergeant Marker, the permissible records check took almost twenty minutes to complete.

At approximately 12:09 p.m., Sergeant Marker received confirmation that each occupant had a current, valid license; that there were no outstanding warrants for them; and that the vehicle was registered to Enterprise. However, at this time, Sergeant Marker also knew that Sergeant Sharp's older brother, Jason, while traveling on Highway 80 (Wall Street), had passed a Chrysler 300 and had seen a backseat passenger smoking and passing marihuana to front-seat passengers. Sergeant Marker also knew that Sergeant Sharp had found the vehicle as Jason had indicated. Sergeant Marker had also found the vehicle on the indicated roadway. As he followed the vehicle, the windows were up, but by the time he had stopped it, all four windows on the vehicle were down. During the initial stage of the stop, Sergeant Marker had seen the driver using a GPS application on his phone. When Sergeant Marker permissibly asked where the occupants were going, he was given a location in Midland that did not exist. Additionally, the occupants, although they had told Sergeant Marker that they had come to Midland for a concert, were looking for a nonexistent address in Midland. Further, the occupants gave Sergeant Marker conflicting answers when he asked them whether they were traveling.

As we have said, Appellant maintains that Sergeant Marker did not have reasonable suspicion to detain Appellant. Appellant separates his argument on this contention into four parts.

The first of those four parts relates to what Appellant denominates as "[t]he Uncorroborated Tip." Appellant argues that the information given to Sergeant Sharp by his brother was not shown to be reliable. Appellant claims that Jason Sharp was an unnamed informant. Appellant then proceeds to analyze the tip under those cases that deal with unnamed informants. This is not the kind of case wherein the

15

informant was an unnamed one. In this case, the citizen informant was not only named, he was the older brother of the supervising sergeant of the Midland Police Department's narcotics unit.

In those situations that involve an anonymous tip, more corroboration is required to establish reliability than with a named informant. *Martinez v. State*, 348 S.W.3d 919, 923 (Tex. Crim. App. 2011). "[W]hen the informant provides self-identifying information that makes himself accountable for the intervention, the degree of reliability significantly improves." *Id.*

To the extent that confirmation is needed, Sergeant Sharp, acting on the tip from his brother, Jason, left his office and looked for the vehicle as described by Jason. Sergeant Sharp found the vehicle in the place and as Jason described and conveyed that information to Sergeant Marker.

Further, Jason gave Sergeant Sharp a firsthand account and a description of wrongdoing—passing a marihuana cigarette from an occupant in the backseat to occupants in the front seat—that was going on as he passed the Chrysler 300. In *Pipkin v. State*, 114 S.W.3d 649 (Tex. App.—Fort Worth 2003, no pet.), the court found that there was adequate corroboration upon which the officer there could have reasonably concluded that the information provided by the citizen informant was reliable. One of the pieces of information that the citizen informant provided was that, when he passed Pipkin's vehicle, he saw Pipkin lighting and smoking a crack pipe. 114 S.W.3d at 653. There is an increase in reliability when the citizen informant gives a firsthand account and description of the unlawful activity. *Houston v. State*, No. 01-18-00925-CR, 2020 WL 573258, at *2 (Tex. App.— Houston [1st Dist.] Feb. 6, 2020, no pet.) (mem. op., not designated for publication). We believe that the information that Jason provided to his younger brother was shown to be reliable.

Appellant labels his next argument: "Atsemet's State Citizenship." Appellant essentially argues that, if courts allow state citizenship and foreign license plates to provide reasonable suspicion, then it would be permissible to stop and detain any vehicle and its occupants just because they were from a "legalized" marihuana state.

As we have noted, Sergeant Sharp and Sergeant Marker testified that they frequently saw marihuana brought in or trafficked from Colorado. Both Sergeant Sharp and Sergeant Marker were experienced in the investigation of narcotics trafficking.

In support of his argument as to out-of-state registration and citizenship, Appellant cites *Vasquez v. Lewis*, 834 F.3d 1132 (10th Cir. 2016), a civil case filed against two Kansas highway patrol officers. In *Vasquez*, the officers laid out several factors that they believed supported reasonable suspicion for the detention in that case. Among those factors: Appellant was traveling on a known drug corridor and was coming from Colorado, a "drug source area." 834 F.3d at 1136–37. The court opined that the fact that Colorado was a medical marihuana state,[2] either alone or in conjunction with the other factors, was unconvincing and did "little to add to the overall calculus of suspicion." *Id.* at 1137 (quoting *United States v. Guerrero*, 472 F.3d 784, 787–88 (10th Cir. 2007)). "Such a factor is 'so broad as to be indicative of almost nothing.'" *Id.* (quoting *Guerrero*, 472 F.3d at 787). Further, the court noted that the factor was an "'extremely weak factor, at best' in the reasonable suspicion calculus because 'interstate motorists have a better than equal chance of traveling from a source state to a demand state.'" *Id.* (quoting *United States v. Beck*, 140 F.3d 1129, 1138 & n.3 (8th Cir. 1998)). However, the court in *Vasquez* also

---

[2]Marihuana use in Colorado is no longer restricted to medical purposes. Voters in Colorado passed a constitutional amendment in 2012 that permitted the sale and use of marihuana for recreational purposes. *See* David Blake & Jack Finlaw, *Marijuana Legalization in Colorado: Learned Lessons*, 8 HARV. L. & POL'Y REV. 359 (2014).

wrote that it was "time to stop the practice of detention of motorists for *nothing more than an out-of-state license plate.*" *Id.* at 1138 (emphasis added).

If, in the last quoted portion from the opinion in *Vasquez*, the court meant that there could be other factors that could increase the value of the out-of-state registration in a reasonable suspicion analysis, then we agree. To the extent that the court in *Vasquez* would hold that an out-of-state registration from a "legalized" marihuana state could never be of value in a reasonable-suspicion analysis in a state in which marihuana has not been legalized, we cannot agree.

Circumstances may be innocent enough in isolation, but when combined, they can reasonably justify a temporary detention. *Derichsweiler*, 348 S.W.3d at 914. We certainly do not endorse willy-nilly stops of vehicles simply because they bear tags from a drug-source state. However, while perhaps not sufficient if considered alone, we believe that, under the facts of this case, the Colorado registration of the rented Chrysler 300 is a legitimate component of the totality of the circumstances to be objectively considered in a determination of reasonable suspicion. *See Robinson v. State*, 174 S.W.3d 320, 329 (Tex. App.—Houston [1st Dist.] 2005, pet. ref'd) (although an affirmative links case, court considered fact that Appellant was traveling along a principal corridor between Mississippi and Houston, a major cocaine distribution point); *see also Maysonet v. State*, 91 S.W.3d 365, 374 (Tex. App.—Texarkana 2002, pet. ref'd) (court upheld a temporary detention where officer relied, in part, on location of rented vehicle and out-of-state registration of the vehicle). Reasonable suspicion includes a consideration of an officer's experience and personal knowledge. *Hoag*, 728 S.W.2d at 380. Again, neither Sergeant Sharp nor Sergeant Marker was a novice in the field of narcotics investigation.

The final point made by Appellant in his lack-of-reasonable-suspicion argument is that the fruits of a *Terry* frisk can never be used to provide justification

18

for a *Terry* stop. Appellant explains his point in this way: "A police officer must first have a reasonable suspicion that an individual was, is, or will be engaged in criminal activity before a *Terry* frisk is ever conducted." In support of that position, Appellant cites to *Carmouche v. State*, 10 S.W.3d 323, 329 (Tex. Crim. App. 2000).

The court in *Carmouche* concluded that the stop there was constitutionally sound based upon the reliable tip of an informant. 10 S.W.3d at 328. After the stop, a Texas Department of Public Safety trooper performed an initial pat-down search of Carmouche. *Id.* at 329. During the pat-down, the trooper found money in Carmouche's pocket. The trial court allowed testimony as to the discovery of the money. On appeal, the question was whether that testimony was admissible. *Id.*

In its review of the legality of the pat-down, the Court of Criminal Appeals pointed to a distinction between reasonable suspicion to believe that a person is involved in criminal activity and the circumstances that warrant a pat-down search. *Id.* (citing *Terry v. Ohio*, 392 U.S. 1, 25–26 (1968)). A pat-down involves exigencies that permit the search. *Id.* Those exigencies "are generated strictly by a concern for the safety of the officers." *Id.* The frisk "is only justified where the officer can point to specific and articulable facts which reasonably lead him to conclude that the suspect might possess a weapon." *Id.*

The trooper in *Carmouche* testified that he performed the pat-down for officer safety and to find drugs. *Id.* at 329–30. The same is true in the case before us now. When we view the evidence in the light most favorable to the ruling of the trial court, the evidence supports a finding that Sergeant Marker was concerned for officer safety when he performed the pat-down. That concern was objectively reasonable for a couple of reasons: roadside encounters are dangerous and "weapons [are] part and parcel for the drug trade." *Id.* at 330 (quoting *United States v. Trullo*, 809 F.2d 108, 113 (1st Cir. 1987)). We hold that it was objectively reasonable for Sergeant Marker to perform the pat-down.

Was the extent of the pat-down valid? "If a police officer lawfully pats down a suspect's outer clothing and feels an object whose contour or mass makes its identity immediately apparent, there has been no invasion of the suspect's privacy beyond that already authorized by the officer's search for weapons . . . ." *Minnesota v. Dickerson*, 508 U.S. 366, 375 (1993). Here, Sergeant Marker, as was the case in *Carmouche*, immediately recognized that what he felt in Appellant's pocket was a "big wad of money." Under the "plain feel" exception to the warrant requirement of the Fourth Amendment, because Sergeant Marker was legitimately performing a pat-down, no additional privacy interest was implicated "by the seizure of an item whose identity is already plainly known through the officer's sense of touch." *Carmouche*, 10 S.W.3d at 330.

Although the results of the frisk could not be used in the calculus of prior reasonable suspicion, the question becomes whether the results could be used to justify further detention. Even if the mission of the traffic stop in this case had been completed, Sergeant Marker could still request consent to search the vehicle. *See Simpson v. State*, 29 S.W.3d 324, 328 (Tex. App.—Houston [14th Dist.] 2000, pet. ref'd) (Although the purpose of a stop has ended, an officer may request consent to search a vehicle). If consent is refused, the officer may not detain the occupants *in the absence of reasonable suspicion that criminal activity is afoot*. *Id.* The question then is whether, under the totality of the circumstances, the information available to or discovered by Sergeant Marker was such that he had specific, articulable facts, taken together with rational inferences from those facts, that would lead him to reasonably suspect that Appellant had engaged in, was then engaged in, or soon would be engaged in criminal activity. We believe that he did.

The State directs us to the information known to Sergeant Marker when he walked back to the rented vehicle after the initial records check: the reliable tip by a named, known citizen who reported that individuals in the vehicle were smoking

20

marihuana; the occupants' conflicting answers as to whether they were traveling that day; the driver's response in which he described a nonexistent address as their destination; and the fact that Appellant and the rented vehicle were from Colorado, "a state in which recreational marijuana was legal." The State maintains that this information "justified a continued detention" after Sergeant Marker had completed the traffic-based inquiries. We agree.

Except for the report that the occupants of the vehicle were smoking marihuana, any one of the facts upon which Sergeant Marker relied might be innocent when considered in isolation. The important question "is not whether particular conduct is innocent or criminal, but the degree of suspicion that attaches to particular non-criminal acts." *Derichsweiler*, 348 S.W.3d at 914. Activities innocent in themselves may, when combined, point to imminent criminal conduct and justify a detention. *Id.* We must look to the totality of the circumstances to assess whether "the detaining officer had a particularized and objective basis for suspecting legal wrongdoing." *Ramirez-Tamayo*, 537 S.W.3d at 36. We use an objective standard: Would the facts available to the officer at the moment of the seizure warrant a person of reasonable caution to believe that the action taken was appropriate? *Powell v. State*, 5 S.W.3d 369, 376 (Tex. App.—Texarkana 1999, pet. ref'd).

When we assess whether reasonable suspicion exists, we consider the ability of an officer to "draw on [his] own experience and specialized training to make inferences from and deductions about the cumulative information available to [him]." *Ramirez-Tamayo*, 537 S.W.3d at 36 (alterations in original) (quoting *United States v. Arvizu*, 534 U.S. 266, 273 (2002)). We cannot ask officers such as Sergeant Marker to ignore their experience and personal knowledge.

In this case, Sergeant Marker was involved in a fluid situation. After the initial valid traffic stop, Officer Marker continued to develop reasonable suspicion that

criminal activity was afoot. He was given conflicting information by the occupants of the vehicle as to where they were traveling. Although the occupants were in Midland, either because they had attended or had performed at a concert, they were looking for a nonexistent Midland address. Sergeant Marker also had information that a citizen informant had seen the backseat occupant smoking marihuana and passing it to the occupants in the front seat. Further, Sergeant Marker's experience was that marihuana was known to come into Midland in vehicles registered in Colorado.

Even if we were to assume that the purpose of the traffic stop had ended before Sergeant Marker asked Appellant for consent to search the vehicle, a law enforcement officer may request consent to search a vehicle after the purpose of a stop has ended. *Simpson*, 29 S.W.3d at 328. Less than twenty seconds after the return on the computer check, Sergeant Marker requested that Appellant exit the vehicle so that he could talk with Appellant about consent. There is an inordinate risk when an officer approaches a person seated in a vehicle. *Pennsylvania v. Mimms*, 434 U.S. 106, 111 (1977). Although Sergeant Marker had already approached the vehicle once, he still had not checked for weapons when he approached the vehicle the second time. Sergeant Marker's asking Appellant to exit the vehicle constituted a *de minimis* intrusion. "What is at most a mere inconvenience cannot prevail when balanced against legitimate concerns for the officer's safety." *Id.*

As we have said, if consent is refused, the officer may not detain the occupants *in the absence of reasonable suspicion that criminal activity is afoot*. In *Rodriguez*, the Supreme Court "granted certiorari to resolve a decision among lower courts on the question whether police routinely may extend an otherwise-completed traffic stop, absent reasonable suspicion, in order to conduct a dog sniff." *Rodriguez*, 575 U.S. at 353. The Court remanded the case for a determination of whether reasonable

suspicion existed. *Id.* at 358. We believe that the facts that we have outlined, under the circumstances that we have outlined, established that reasonable suspicion continued to exist.

Further, continuing detention was justified after Sergeant Marker found the "wad of money" in Appellant's pocket. *Cf. Nickerson v. State*, 645 S.W.2d 888, 892 (Tex. App.—Dallas), *aff'd*, 660 S.W.2d 825, 827 (Tex. Crim. App. 1983) (large sums of cash considered to be evidence in connection with contraband to determine affirmative links). It is common knowledge that drug dealing involves large amounts of money. *Gonzales v. State*, 761 S.W.2d 809, 814 (Tex. App.—Austin 1988, pet. ref'd). If consent is refused, the officer may not detain the occupants *in the absence of reasonable suspicion that criminal activity is afoot*. *Id.* We believe that the facts that we have outlined, under the circumstances that we have outlined, established reasonable suspicion.

We hold that Sergeant Marker had specific, articulable facts that, taken together with rational inferences from those facts and with his experience and personal knowledge, would lead him to reasonably suspect that Appellant had engaged in, was then engaged in, or soon would be engaged in criminal activity. We further hold that, under the circumstances of this case, Sergeant Marker conducted his investigation in such a manner that it was likely to quickly dispel or confirm his suspicions. *See Sharpe*, 470 U.S. at 686. We overrule Appellant's first issue on appeal.

In Appellant's second issue on appeal, he claims that "[t]he trial court erred in admitting evidence over [Appellant's] timely trial objection of the cash monies found on [Appellant's] person as the police had no reasonable suspicion to conduct a *Terry* frisk." It appears that Appellant's argument focuses on the assertion that "Officer Marker had no particular and articulable facts to believe that [Appellant] was armed and dangerous."

Appellant correctly maintains that a *Terry* stop and a *Terry* frisk serve different purposes. *See Terry*, 392 U.S. at 23; *Carmouche*, 10 S.W.3d at 329. The former involves reasonable suspicion that criminal activity is afoot. *Carmouche*, 10 S.W.3d at 329. We have already decided that issue. The latter involves a concern for officer safety. *Id.* A *Terry* frisk "is only justified where the officer can point to specific and articulable facts which reasonably lead him to conclude that the suspect might possess a weapon." *Id.* The test is not whether an officer, subjectively, was in fear. The test is whether a reasonably prudent officer would believe, objectively, that a suspect was armed and dangerous. *Id.* at 330.

The encounter in this case was a roadside one. Those types of encounters can be dangerous. *Id.* It matters not that other officers were present. In *Williams*, there were two officers present, yet the court referred to the dangerousness of roadside encounters. *Williams v. State*, 27 S.W.3d 688, 690 (Tex. App.—Beaumont 2000, no pet.). In *Carmouche*, multiple officers were present. *Carmouche*, 10 S.W.3d at 326–27.

Further, a reasonable belief that a person might be armed and dangerous can be based upon the nature of the suspected criminal activity. *Id.* at 330. Weapons and violence are often associated with drug trafficking. *United States v. Brown*, 913 F.2d 570, 572 (8th Cir. 1990). "[C]oncealed weapons [are] part and parcel for the drug trade." *Carmouche*, 10 S.W.3d at 330 (quoting Trullo, 809 F.2d 113).

In this case, the encounter was a roadside one. Additionally, the suspected activity was drug related. In line with the above authorities, we hold that the evidence supports a finding that Sergeant Marker, objectively, possessed sufficient "specific and articulable facts which reasonably [led] him to conclude that [Appellant] might possess a weapon." *Id.* at 329.

Appellant also appears to contend that Sergeant Marker exceeded the proper scope of the pat-down. Appellant maintains, in a footnote to his brief, that

Sergeant Marker never testified that he knew from the feel of the "wad" that it was cash. Therefore, claims Appellant, "the introduction of this evidence did not fall under the 'plain feel' exception to a *Terry* frisk." We read the record differently. During the hearing on the motion to suppress, Sergeant Marker testified: "Basically, I could feel in his front pocket, it -- what appeared -- it seemed like money, felt like a big wad of money to me, and that's what it was."

"If a police officer lawfully pats down a suspect's outer clothing and feels an object whose contour or mass makes its identity immediately apparent, there has been no invasion of the suspect's privacy beyond that already authorized by the officer's search for weapons . . . ." *Dickerson*, 508 U.S. at 375. This is the "plain feel" or *Dickerson* exception to the warrant requirement under the Fourth Amendment. Sergeant Marker recognized the "wad" in Appellant's pocket as a "wad of money." When Sergeant Marker got the money out of Appellant's pocket, no privacy interest in addition to that already implicated by the *Terry* frisk was infringed upon. *See Carmouche*, 10 S.W.3d at 330–31. Because it was objectively reasonable for Sergeant Marker to engage in a pat-down of Appellant, and because the pat-down did not exceed the permissible scope, the trial court did not abuse its discretion when it admitted evidence of the money recovered from Appellant. We overrule Appellant's second issue on appeal.

Finally, we address Appellant's third issue on appeal. In that issue, Appellant asserts that "[t]he trial court erred in overruling [Appellant's] TEX. R. EVID. R. 402 objections to irrelevant testimonial evidence." The evidence about which Appellant complains is the testimony from Sergeant Sharp and Sergeant Marker relative to their experience in connection with the movement of marihuana into Texas, specifically into Midland.

Rule 401 of the Texas Rules of Evidence provides that "[e]vidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be

without the evidence; and (b) the fact is of consequence in determining the action." TEX. R. EVID. 401. Rule 402 of the Texas Rules of Evidence provides that relevant evidence is admissible unless certain exceptions, not relevant here, apply. The rule also provides that "[i]rrelevant evidence is not admissible." TEX. R. EVID. 402.

Appellant reiterates his argument that the complained-of evidence could not serve as the basis for reasonable suspicion to conduct the *Terry* stop and the *Terry* frisk. We have decided that issue contrary to Appellant and need not revisit that here. Appellant also argues that the evidence was irrelevant as to whether Appellant had joint possession of the marihuana. We do not agree with Appellant.

"Relevant evidence is evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more or less probable than it would be without the evidence." *Charleston v. State*, 834 S.W.2d 517, 518 (Tex. App.—Corpus Christi–Edinburg 1992, no pet.). The admission or exclusion of evidence is a matter that is within a trial court's sound discretion, and its rulings will not be disturbed absent a showing of an abuse of that discretion. *Montgomery v. State*, 810 S.W.2d 372, 391 (Tex. Crim. App. 1991).

As we said earlier, it was incumbent upon the State to prove that Appellant possessed the marihuana. We believe that the fact that Appellant was from Colorado and the fact that the marihuana was found in a vehicle that he had rented in Colorado are relevant to whether Appellant exercised control, management, or care over the marihuana that was found in the trunk of that vehicle and that he knew that the marihuana was contraband.

Because the evidence was relevant and because, in the first instance, all relevant evidence is admissible, it was Appellant's obligation to show some reason why that relevant evidence was not admissible. For instance, a defendant may object that the probative value of the evidence was substantially outweighed by the danger of unfair prejudice arising from its admission. *Costilla v.*

*State*, No. 11-96-00343-CR, 1997 WL 33798007, at *1 (Tex. App.—Eastland Sept. 11, 1997, no pet.) (not designated for publication). Appellant made no objections under any rule or statute other than Rule 401.

We hold that the testimony relative to Appellant's residence in Colorado and of his renting the vehicle there tended to make the existence of the fact of possession of the marihuana more or less probable than it would have been without the evidence. We overrule Appellant's third issue on appeal.

We affirm the judgment of the trial court.

JIM R. WRIGHT
SENIOR CHIEF JUSTICE

April 30, 2020

Do not publish. *See* TEX. R. APP. P. 47.2(b).

Panel consists of: Bailey, C.J.,
Stretcher, J., and Wright, S.C.J.[3]

Willson, J., not participating.

---

[3]Jim R. Wright, Senior Chief Justice (Retired), Court of Appeals, 11th District of Texas at Eastland, sitting by assignment.